371 P.2d 879

COMBUSTION ENGINEERING, INC., a corporation, Appellant and Cross-Appellee,

v.

ARIZONA STATE TAX COMMISSION, a body corporate and politic; and Thad Moore, Warren Peterson, and William E. Stanford, as members of and constituting said Arizona State Tax Commission, Appellees and Cross-Appellants.

No. 7117.

Supreme Court of Arizona.

En Banc.

May 23, 1962.

Snell & Wilmer, Phoenix, for appellant and cross-appellee.

Wade Church, Former Atty. Gen., Robert W. Pickrell, The Atty. Gen., Stanley Z. Goodfarb, Former Asst. Atty. Gen., Joe R. Purcell, Former Asst. Atty. Gen., Phillip M. Haggerty, Asst. Atty. Gen., Phoenix, for appellees and cross-appellants.

LOCKWOOD, Justice.

This is an appeal by Combustion Engineering Inc., a Delaware Corporation, hereafter referred to as the company, and a cross appeal by the Arizona State Tax Commission, from a summary judgment granting the company a partial recovery of taxes it had paid under protest.

The facts stipulated by the parties were in substance as follows: The company has its principal offices in New York City, sales offices in twenty-six United States cities, representatives in the territories and many foreign countries, and seven manufacturing plants in the United States and Canada. During the audit period in question [1] the company had no office, employee, plant, soliciter, warehouse, dealer or representative of any type in Arizona.[2] The company designs, manufactures and sometimes performs the complete field erection of steam generating equipment for power plants,[3] its units (or boilers) having capacities ranging up to 3,000,000 pounds of steam per hour, steam temperatures up to 1200 degrees Fahrenheit, and pressure up to 5,000 pounds per square inch.[4] A large boiler requires two or more years from the time manufacture begins to the time it is assembled, tested, and in operation at the customer's power plant of which it becomes a

1. October 1, 1953 to November 30, 1954.
2. Except for job-site employees sent to Arizona in connection with the contracts which are the subject of this case.
3. The company performs the complete field erection for about twenty-two per cent of all of the units it sells, so that in about seventy-eight per cent of the cases the purchaser arranges for its own field erection, except for certain matters set forth *infra*.
4. These units consist of water cooled furnaces, superheaters, desuperheaters, reheaters, economizers, and air preheaters, supported by structural steel members, enclosed in suitable brick work and insulated casings, with appurtenant equipment such as that required for fuel burning. The purpose of the unit is to create steam; separate the steam from the water; put the steam through a superheater, the function of which is to raise the temperature of the steam without raising its pressure and then to deliver the steam to the turbine. The turbine, which is no part of this unit, is in turn, activated by the steam and upon such activation generates electricity.

major component. The primary raw material is steel and the most important market for the boilers is the electric utility industry. The boilers are not stock items but are engineered by the company to the customer's specifications from the ground up. However the company's vice president stated in an affidavit that they also manufacture a small package boiler which functions like the large one but is regularly shipped completely assembled and is not custom made. For the smaller boiler there is no need, as there is for the larger ones, to have brick or insulation work done at the jobsite for this is done at one of the factories.

The instant case involves the sale of two of the large boilers to Arizona Public Service Company for its Saguaro Power Plant near Tucson, Arizona. Four contracts were entered into in New York City, "* * * being placed there by Ebasco Services Incorporated (as agent) for the Arizona Public Service Company, the purchaser, and the plaintiff Company, as seller." The contracts and supplements thereto were in the form of purchase orders or offering letters accepted by the company.

The first contract was entered into on March 12, 1951 and called for the company to furnish two boilers together with a limited amount of labor with respect thereto. By a supplement dated December 19, 1952 one of the boilers was cancelled, and the labor was excluded; thus the contract as supplemented dealt only with the materials for a single boiler. The second contract provided that the company should:

"Unload from cars, deliver to site and erect the Brickwork and all Heat Insulation including that on piping, gas ducts, air ducts, tubing and all other parts requiring insulation, also furnish Superintendence of Erection and/or services of Supervising Engineers to direct and supervise the complete erection of the Unit and to advise and consult with in connection with all preliminary processes and the full demonstration of all performance guarantees for the [unit covered by the first contract]."

Supplements to the second contract provided that: 1) the purchaser did not choose to have the company perform the complete field erection of the boiler; 2) the company was authorized to furnish a radiographer, welding technician and qualified welders; and 3) the company could award the erection of brickwork and insulation to two named contractors. The third contract dated August 12, 1952 covered materials for a second boiler which was to be a duplicate of the first, and the fourth contract as supplemented dealt with the same matters covered by the second contract but was applicable to the boiler ordered under the third contract. The first and third contracts

will hereafter be referred to as the "materials contracts", and the second and fourth as the "labor contracts".

The equipment manufactured by the company under the materials contracts was shipped f. o. b. point of origin, each point being at a plant outside of Arizona, and in every case freight was paid by the purchaser. Payment for work done and materials purchased under the contracts was transmitted by the purchaser to the company's offices in New York. In each case, however, the contract provided that the last ten per cent of the contract price or the balance due should be paid "after successful demonstration of all performance guarantees but not later than six months after completion of erection provided seller has fulfilled all other terms and conditions of the contract." The materials con-

tracts accounted for ninety-one per cent of the cost of the first boiler and ninety-two per cent of the second, and accordingly the labor contracts constituted nine per cent of the cost of the first and eight per cent of the second.[5]

The purchaser employed Ebasco, the general contractor it used to build its entire power plant, to perform the field erection of the boilers. The company, in compliance with the labor contracts, supplied a superintendent of erection and furnished the radiographer, welding technician and qualified welders to work for the purchaser's contractor.[6] Ebasco's work on each unit consisted of erecting a structural steel support from which the 110 X 40 foot, 2500 ton unit was to be hung; hanging a forty foot drum and the headers which had been completely fabricated by the company at

---

5. The costs of the contracts after escalation due to increased costs were:

first materials contract — $ 1,437,921.32
first labor contract — 141,911.93
second materials contract — 1,478,995.45
second labor contract — 128,407.14

6. An affidavit by an independent engineer on behalf of the commission stated: "that in all probability [a local] firm could handle nearly all the local activities done by [the company under the labor contracts]." That these activities were: "[t]o assist in the actual construction of the equipment in accordance with specification, and" to determine liability "in the case of malfunction and non-conformance with specifications, and that the complexity of construction or assembly of the equipment was not necessarily the major factor."

\*      \*      \*      \*      \*

"That a condition of sale is that said steam generating units must perform as set forth in the specifications, and that until required performance of said steam generating units is shown by the seller, purchaser makes no final acceptance of said equipment."

\*      \*      \*      \*      \*

"That because of the use of component parts and sub-assemblies to create a steam generating unit of the size involved and because of the necessity to construct a 110′ high X 40′ wide steel framework upon which to attach said component parts or sub-assemblies, it must of necessity be said that said steam generating units are 'constructed' upon the jobsite from the parts involved rather than 'assembled or re-assembled' as a manufactured item."

its Chattanooga, Tenn. plant; and installing the supply drum, also fabricated in Chattanooga. The next operation was to install the water wall tubing which was also prefabricated in Chattanooga, but since much of it was too long to be completely assembled and shipped from there, it was welded together at the jobsite. Although both the welding and the installation was done by Ebasco, the company supplied about ten certified welders to the contractor because of the critical nature of that job. Ebasco next installed superheaters fabricated in Chattanooga and air preheaters and fans purchased by the company from firms outside Arizona. Air and gas ducts were then constructed by Ebasco and finally the brick and insulation work around the outside of the unit was done by the subcontractor employed by the company.[7]

On November 1, 1955 the Arizona State Tax Commission assessed the company $26,553.20 as taxes on the proceeds received from the four contracts. The commission was acting pursuant to A.C.A. § 73–1303 (g) (1939) as amended which reads:

"* * * there is hereby levied and shall be collected by the tax commission * * * annual privilege taxes measured by the amount or volume of business done by the persons on account of their business activities and in the amounts to be determined by the application of rates against values, gross proceeds of sales, or gross income, as the case may be, in accordance with the following schedule:

* * * * * *

"(g) At an amount equal to one per cent [1%] of the gross proceeds or gross income from the business, upon every person engaging or continuing in the business of contracting. Payments made by the contractor for labor employed in construction, improvements or repairs shall not be subject to the tax herein imposed."[8]

The company petitioned for a correction or redetermination and protested the assessment except for that part applicable to the labor contracts ($417.91) for which it submitted a check. The commission, after a hearing, denied the company's petition; therefore the company paid the balance of the assessment under protest, protested the $417.91 and brought suit in superior court for a refund.

The company contended: 1) that it had not engaged in contracting in Arizona within the meaning of the statute, 2) that if it had, all contracts were relevant and

---

**7.** It was stipulated that the question of the tax liability of the brick and insulation contractors and the purchaser's general contractor (Ebasco), for the work each did in respect to the steam generating units here concerned, was not an issue in this case.

**8.** A.R.S. §§ 42–1309, subd. A and 42–1310, subd. 2(i) (1956) presently in force are in substance the same.

appropriate to interstate commerce and therefore wholly immune from state taxation and 3) at the very most the tax would have to be limited to the Arizona activities, thereby excluding the income attributable to the materials purchased outside the state. The case was submitted by both parties to the trial court for summary judgment on the basis of the pleadings, fact stipulation and affidavits.

The court made findings of fact that: a) "By reason of the activities performed by the Company under all of the contracts, the Company engaged in the business of 'contracting' within the state of Arizona * * *." b) "The activities of the Company under the labor contracts were 'relevant and appropriate' to the sale of the materials by the Company under the materials contracts." and c) "It was the intention of the parties, sufficiently expressed in the contracts when considered as a whole, that title to these goods pass outside of the State of Arizona, and title did so pass outside * * *."

In its conclusions of law the trial court stated that there was no absolute immunity of interstate commerce from state taxation but that a transaction taking place outside the state could not be taxed. It concluded that the receipts of the company

from the materials, title to which passed outside Arizona, could not be taxed, but the business of contracting measured by the gross income arising from construction activities within the state could be, even though the latter was relevant and appropriate to the interstate transaction. The court entered judgment for the commission to the extent of $417.91 and for the company in the amount of $24,266.02 [9] plus interest and costs.

Each party makes only one assignment of error. The company urges that the court was wrong in holding that a state could levy a tax upon the privilege of engaging in interstate commerce, and the commission makes the general assignment of error that the trial court's judgment against it was contrary to the evidence. Under these assignments, the real questions presented for our determination by the appeal and cross appeal are whether, in the transaction set out in detail above, the tax assessed by the commission: should be measured by the company's gross receipts derived from all four contracts, should be measured only by receipts from the two labor contracts, or should fail altogether.

■ We disagree with the company's contention that we are bound by the trial court's findings of fact in this case. No

9. An additional $1,869.27 attributable to certain materials had already been refunded from the original protest fund of $26,553.20 since the tax was paid by a subcontractor.

testimony was adduced, and the summary judgment was based upon the pleadings, the stipulation of facts, the contracts made a part thereof by reference and affidavits not raising any conflicts of facts. What were labeled "findings of fact" are in reality conclusions of law, and therefore we are not bound by them, but are at liberty to draw our own legal conclusions from the admitted facts before us.[10]

█ The statute under which the commission assessed the tax in question[11] is part of the Excise Revenue Act of 1935, as amended, which act has on many occasions been held to be "a tax on the privilege or right to engage in business and * * * not a sales tax."[12] "* * * [B]oth in practical and legal effect the tax is upon the person conducting a business and not upon the transaction, the sale."[13]

█ Although Mr. Justice Clark in delivering the opinion of the Supreme Court in Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959) stated that there was need for clearing up the tangled underbrush of past cases dealing with the taxing power of the states, he also said (at 458, 79 S.Ct. at 362) that "it

is beyond dispute that a State may not lay a tax on the 'privilege' of engaging in interstate commerce." The leading U. S. Supreme Court case on the subject is Spector Motor Service v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951). There Connecticut sought to tax the company for the privilege of doing business in that state. Although the company was engaged only in *interstate* commerce in the state, the tax was apportioned to that part of the net income attributable to the business activities within the state and it neither discriminated against, nor placed an undue burden upon, such interstate commerce. The court, however, held the tax to be invalid because the Connecticut court had said it was a privilege tax. The Supreme Court said:

"Even though the financial burden on interstate commerce might be the same, the question whether a state may validly make interstate commerce pay its way depends first of all upon the constitutional channel through which it attempts to do so.

\* \* \* \* \* \*

"[The states] delegated to the United States the *exclusive* power to tax

10. Sanders v. Brown, 73 Ariz. 116, 238 P. 2d 941 (1951). See also the cases cited therein.
11. A.C.A. § 73–1303(g) (1939), presently covered by A.R.S. §§ 42–1309, subd. A and 42–1310, subd. 2(i) (1956).

12. Arizona State Tax Comm. v. Garrett Corporation, 79 Ariz. 389, 391, 291 P.2d 208 (1955). See also the cases cited therein.
13. 79 Ariz. at 393, 291 P.2d at 210.

the *privilege* to engage in *interstate* commerce \* \* \*." 340 U.S. at 608, 71 S.Ct. at 511.

"\* \* \* Our conclusion is not in conflict with the principle that, where a taxpayer is engaged *both* in intrastate and interstate commerce, a state may tax the privilege of carrying on intrastate business and, within reasonable limits, may compute the amount of the charge by applying the tax rate to a fair proportion of the taxpayer's business done within the state, including both interstate and intrastate." 340 U.S. at 609–610, 71 S.Ct. at 512. (Emphasis added.)

Thus in order to uphold, in this case, a tax which we have many times said is a privilege tax, we must find that at least some of the activities of the company were *intrastate.*

This court has on two occasions been called upon to decide if installation work constituted interstate or intrastate commerce. In Weber Showcase & Fixture Co. v. Co-Ed Shop,[14] the question was whether the installation of office fixtures by the out of state seller was intrastate so that the legislature could condition the seller's right of access to state courts.

In holding that it was not, the following rule was set forth:

"'If the particular provision in the contract for the assembly and erection at the point of destination of the goods sold was a *relevant and appropriate* part of the sale, the entire transaction is one of interstate commerce.'

"In applying this rule to the facts of any particular case, we should consider primarily whether the work performed was necessary to put the goods sold into condition for the use for which they were destined, or was work over and above that required by the inherent nature of the subject-matter of the sale." 47 Ariz. at 419, 56 P.2d at 669.

In State Tax Commission v. Murray Co. of Texas, Inc.,[15] we held that the company was not engaged in sufficient localized activities for the imposition of "a transaction privilege tax as provided for under the provisions of A.R.S. § 42–1301 et seq." In that case the company: 1) consigned a stock of cotton gin repair parts to an Arizona Corporation, 2) had a sales representative soliciting orders within the state for gins and steel buildings, 3) provided an expert in assembling and installing gins[16]

14. 47 Ariz. 415, 56 P.2d 667 (1936).
15. 87 Ariz. 268, 350 P.2d 674 (1960), Judgment vacated and case remanded for clarification, 364 U.S. 289, 81 S.Ct. 53, 5 L.Ed.2d 39 (1960), Second Opinion, 89

Ariz. 61, 358 P.2d 167 (1960), cert. den'd. 366 U.S. 950, 81 S.Ct. 1903, 6 L.Ed.2d 1243 (1961).
16. The gins were shipped to Arizona in a knocked-down condition and here as-

and 4) furnished a superintendent and a helper for the construction of steel buildings shipped in a knocked down condition. We said:

"Until such machinery is assembled and installed it is incapable of application to the use for which it was manufactured. The work of assembling and installing and the cost thereof is of comparative insignificance to the cost of manufacturing it." 87 Ariz. at 272, 350 P.2d at 677.

We held that the sales of the gins and steel buildings being interstate transactions, the company's "other business activities did not convert such sales into intrastate transactions." 89 Ariz. at 62, 358 P.2d at 168.

The decisions from other jurisdictions [17] are consistent with the policy set forth in the Weber and Murray cases. Thus where the installation activities have been held to be intrastate it has been attributed either to the fact that such work was over and above that required by the inherent nature of the subject matter of the contract,[18] or that such work constituted *a substantial part* of the performance of the whole contract.[19] On the other hand where the local activities have been a small but essential part of the interstate contract for

sembled, and when requested the company expert supervised the assembly, installation and testing.

17. For a thorough discussion of cases holding both ways see Gross Income Tax Division of Indiana v. Surface Combustion Corp., 232 Ind. 100, 111 N.E.2d 50 (1953), cert. den'd. 346 U.S. 829, 74 S.Ct. 51, 52, 98 L.Ed. 353, 354 (1953).

18. Browning v. City of Waycross, 233 U.S. 16, 34 S.Ct. 578, 58 L.Ed. 828 (1914) (contract for sale and installation of lightning rods. The court said at 23, 34 S.Ct. at 581: "* * * some suggestion is here made that the putting up of the lightning rods after delivery by the agent of the seller was so vital and so essential as to render it impossible to contract without an agreement to that effect,—a suggestion, however, which we deem it unnecessary to do more than mention in order to refute it.")

19. General Railway Signal Co. v. Commonwealth of Virginia, 246 U.S. 500, 38 S.Ct. 360, 62 L.Ed. 854 (1918) (installation of railroad signal devices); Dravo Contracting Co. v. James, 114 F.2d 242 (4th Cir. 1940) cert. den'd., 312 U.S. 678, 61 S.Ct. 450, 85 L.Ed. 1117 (1941) (con-

struction of locks and dams in West Virginia); Gross Income Tax Division v. Fort Pitt Bridge Works, 227 Ind. 538, 86 N.E.2d 685 (1949), rehearing den'd., 87 N.E.2d 721 (1949) (fabrication of materials and construction of building, where over one third of contract costs were for construction); Stone v. York Ice Machinery Corporation, 193 Miss. 638, 10 So.2d 380, (1942) ("Where such a substantial portion of the contract for the sale, installation, adjustment and testing of the air-conditioning systems involved in this case was performed in this State, as a condition precedent to its final acceptance by the purchaser, * * * the contention of the [company] as to its nonliability for the taxes in question, if sustained, would work an unjust discrimination against those residing in this State who may undertake to manufacture and install machinery and equipment * * *." 10 So.2d at 385); Riley Stoker Corporation v. State Tax Commission, 3 Utah 2d 164, 280 P.2d 967 (1955) (twenty-three per cent of the contract price covered the costs of assembling and constructing steam generating plants).

the sale of equipment, such activities have been held to be a completion of the manufacturing that had begun outside, and thus a part of the interstate transaction.[20]

In the instant case over ninety-one per cent of the payment received by the company under the four contracts was attributable to its work outside Arizona for materials and in fabricating the various component parts of the boiler. Thus less than nine per cent was due to its supervising, welding, etc. in Arizona. We believe that nine per cent is not so substantial a part of the whole transaction as to take these activities out of interstate commerce.[21]

That the company's Arizona activities were required by the inherent nature of the subject matter of the contracts made in interstate commerce is evident from the facts set forth above. The contracts were made in New York, all of the component parts with which we are concerned were fabricated in Tennessee, Indiana and elsewhere outside Arizona. The purchaser was buying and the company was selling "boilers" and not just the parts. Whereas small boilers were shipped intact and the insulation and brickwork done at the factory, it was physically impossible to ship the large ones preassembled, thus some of the work had to be done in Arizona. If, upon the completion of the assembly and erection, the boilers had not met with all the specifications set out in the contract, they could have been rejected by the purchaser.

20. York Mfg. Co. v. Colley, 247 U.S. 21, 38 S.Ct. 420, 62 L.Ed. 963 (1918) (contract for manufacture, delivery and installation of an ice plant where the various parts and machines were shipped disassembled; company engineers supervised assembly and installation by purchaser's laborers and tested the plant before acceptance); Palmer v. Aeolian Co., 46 F.2d 746 (8th Cir. 1931), cert. den'd, 283 U.S. 851, 51 S.Ct. 560, 75 L.Ed. 1458 (1931), and Aeolian Co. v. Fischer, 40 F.2d 189 (2nd Cir. 1930) (both dealt with contracts to build, deliver and install organs, and courts both said the high degree of skill and understanding required in the installation, makes installation an integral part of the sale); Gross Income Tax Division of Indiana v. Surface Combustion Corp., 232 Ind. 100, 111 N.E.2d 50 (1953), cert. den'd., 346 U.S. 829, 74 S.Ct. 51, 52, 98 L.Ed. 353, 354 (1953) (furnaces shipped partly "knocked down" and then assembled and installed at the plant of the customer by factory engineers, supervisors and workmen); Vilter Mfg. Co. v. Evans, 86 Ind.App. 144, 154 N.E. 677 (1927) (erection and installation of a refrigerating plant by local laborers under supervision of company engineers); Kaw Boiler Works Co. v. Interstate Refineries, 118 Kan. 693, 236 P. 654 (1925) (company experts and trained workmen assembled oilcracking refinery); Hess Warming and Ventilating Co. v. Burlington Grain Elevator Co., 280 Mo. 163, 217 S.W. 493 (1919) (company men sent to supervise the erection and installation of grain dryer from various parts which were shipped from out of state).

21. This is less local activity than was present in the Murray case or those referred to in note 19, except that it is about the same as in the Stone case. It is also less than was present in many of the cases cited in note 20.

Even if, as the affidavit of an engineer on behalf of the commission states,[22] everything the company did might have been done by a local firm, nevertheless the company considered the erection a complex enough operation so that it *never* permitted the final assembly and erection to be done without its supervision, expert welders, etc. In view of all the time and money that had been expended by this stage of the operation, it would not have been sound business practice for the company to pull out and risk a slip up and the resulting rejection by the purchaser. Thus we do not believe that the activities of the supervisor, welders, radiologist, and insulation and brick contractors in Arizona constituted the local construction of boilers from materials contracted for and fabricated in interstate commerce. Instead these were activities "necessary to put the goods sold into condition for the use for which they were destined,"[23] because "[u]ntil such machinery is assembled and installed it is incapable of application to the use for which it was manufactured."[24] The Arizona activities were the completion of the manufacture of boilers begun outside the state and thus a "relevant and appropriate" part of the interstate sale.

Since: 1) the entire transaction was interstate commerce, 2) a state cannot impose a tax on the privilege of engaging in interstate commerce and 3) the tax in question is a privilege tax; therefore the decision of the lower court is affirmed insofar as judgment was rendered in favor of the company and reversed insofar as judgment was for the commission.

BERNSTEIN, C. J., UDALL, V. C. J., and STRUCKMEYER and JENNINGS, JJ., concur.

22. See note 6 supra.
23. 47 Ariz. at 419, 56 P.2d at 669.

24. 87 Ariz. at 272, 350 P.2d at 677.