398 P.2d 908

**ARIZONA STATE BOARD OF MEDICAL EXAMINERS, Appellant,**

v.

**Clarence Laurence CLARK, Appellee.**

No. 7239.

Supreme Court of Arizona.

En Banc.

Feb. 3, 1965.

Wade Church, Former Atty. Gen., Robert W. Pickrell, Atty. Gen., by Charles T. Stevens, Asst. Atty. Gen., for appellant.

Johnson, Darrow, D'Antonio, Hayes & Morales, Tucson, for appellee.

BERNSTEIN, Justice.

Dr. Clarence L. Clark, the appellee, filed an application for a license to practice medicine and surgery in the State of Arizona with the State Board of Medical Examiners on December 3, 1958. On June 22, 1959, the Board cited Dr. Clark pursuant to A.R.S. § 32–1452A [1] to show cause why his application should not be denied. Dr. Clark filed a sworn answer and thereafter a hearing was held at which Dr. Clark was the only witness. After the hearing the Board secured a deposition in support of one of the Specifications, at the taking of which Dr. Clark was represented by counsel. On October 16, 1959, the Board entered an order denying Dr. Clark's application. Dr. Clark then filed a Petition for Review in Maricopa County Superior Court, under the provisions of A.R.S. § 32–1453B. After reviewing the entire record of the hearings before the Board, including the deposition of Dr. George M. Cowan of Duluth, Minnesota and letters submitted by Dr. Clark, hearing arguments of counsel, and considering the briefs, as required by the statute, the trial judge set aside the order of the Board, and directed it to issue the appropriate license. The Board of Medical Examiners has appealed to this court pursuant to A.R.S. § 32–1453H.

Dr. Clark was graduated in 1940 with an M.D. degree from the St. Louis University School of Medicine in Missouri.

1. The present statute regulating the practice of medicine is Laws 1964, Ch. 27. It is a complete revision of the prior statute, and nothing said herein necessarily applies to the present law. Quotations and section references herein are from the law as it was at the time relevant to this case.

At the time of the filing of the application he was, and now is, licensed to practice medicine in the States of Missouri, Michigan and Minnesota.

In 1948 Dr. Clark accepted employment with the Arrowhead Clinic in Duluth, Minnesota, and moved his family from St. Louis, Missouri to Duluth. At the time he accepted employment with the Arrowhead Clinic, he had no knowledge that the Arrowhead Clinic was not in good standing with the St. Louis (Minn.) County Medical Society, because of certain contracts which it had with labor unions that the Society believed interfered with the free practice of medicine. To avoid confusion it should be pointed out that Duluth is located in St. Louis County, Minnesota. There are no complaints about any act of Dr. Clark in Missouri or Michigan. About three months after moving to Duluth, Dr. Clark became aware of the strained relation between the St. Louis County Medical Society and the Arrowhead Clinic when the Medical Society refused his application for membership. At some later date he was admitted to membership in that Society, and suspended on January 17, 1959, after the Arizona application was filed. At the time this complaint was filed, the grounds for refusal by the Board of a license to practice medicine under A.R.S. § 32–1452A were:

"A. The board shall refuse a certificate to any applicant who is mentally or physically unable safely to engage in the practice of medicine and surgery or who is *guilty* of unprofessional conduct, but before refusal the applicant shall be cited upon a sworn complaint filed with the board, *charging the applicant with* such inability or *having been guilty of unprofessional conduct*, and setting forth the particular facts of such inability or act constituting such conduct. * * *" (Emphasis supplied.)

■ Dr. Clark may be refused a license only if he has been guilty of unprofessional conduct and charges have been proven by competent evidence after notice and hearing. He cannot be denied a license to practice in Arizona merely because accusations have been made against him by an out of state medical society. See In re Abbatangelo's Petition, Nev., 397 P.2d 182.

"Unprofessional conduct" is defined in A.R.S. § 32–1401. The only part of that definition relevant to this case is subsection 2(*l*) which reads:

"(*l*) Any conduct or practice contrary to recognized standards of ethics of the medical profession or any conduct or practice which constitutes a danger to the health, welfare or safety of a patient or the public."

The complaint, although inartfully drawn, was legally sufficient to confer jurisdiction on the Board to hear and determine the matter. Some of the Specifications include charges that are barred by the two year statute of limitations provided in A.R.S. § 32–1452C. See also, Eastman v. Southworth, 87 Ariz. 394, 351 P.2d 992. The Board in reaching the decision which it now asks us to affirm concedes that it erred in considering barred matters which were abandoned for the first time on this appeal.

The statute governing the review in this case, A.R.S. § 32–1453, was adopted in 1952, after the adoption of the Federal Administrative Procedure Act.[2] Prior to that time review of the actions of the Arizona Board of Medical Examiners had been by the common law writ of certiorari. DuVall v. Board of Medical Examiners, 49 Ariz. 329, 66 P.2d 1026. Under A.R.S. § 32–1453 the trial judge must review the entire record. A.R.S. § 32–1453G provides:

"G. The court may affirm the decision of the board or remand the case for further proceedings, or it may reverse or modify the decision if the substantial rights of the petitioners have been prejudiced because the administrative findings of the board are:

"1. In violation of a constitutional provision.

"2. In excess of the statutory authority or jurisdiction of the board.

"3. Affected by other error of law.

"4. Unsupported by competent, material and substantial evidence in *view of the entire record* as submitted.

"5. Arbitrary or capricious." (Emphasis supplied.)

This section of the statute, with minor changes not material to the problem involved here, is taken from the judicial review section of the Model State Administrative Procedure Act § 12(7), 9C Uniform Laws Annotated page 184. This act was suggested for general adoption by the Commissioners on Uniform State Laws to apply the principles of the Federal Administrative Procedure Act.

In the Report of the Committee on Tentative Draft of Uniform Act on Administrative Procedure to the 1943 Conference

---

2. Prior to 1946, statutory provisions relating to judicial review generally provided for as limited a judicial review as was thought to be constitutionally permissible. The growth of federal administrative agencies led to a search for fairer standards of judicial review. The most important study was that of the Attorney-General's Committee of Administrative Procedure, which led to the passage of the Federal Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., in 1946. The states, including Arizona, took advantage of these studies, and generally revised their provisions for the judicial review of administrative decisions.

of Commissions on Uniform State Laws, with regard to the judicial review section which uses the language of A.R.S. § 32–1453G, the Committee stated:

"The above section is one of the most important in the act. * * *

"The crux of any plan for judicial review of the decisions of administrative tribunals lies in the scope of review to be allowed. . . . Almost [sic] every court that has had to deal concretely with the problem has vacillated in the course of time from one pole to the other. The full range of review extends from a complete trial de novo on the one hand to review limited to controverted questions of law on the other. * * *"

■ This legislative history contradicts the Board's contention that its denial of a license to Dr. Clark must be upheld by the Superior Court if there is *any* evidence in the record to sustain its decision. That rule no longer applies under A.R.S. § 32–1453G.

■ The significance of the reference to the "entire record" was explained by Mr. Justice Frankfurter in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 481, 71 S.Ct. 456, 460, 95 L.Ed. 456 as follows:

·"Three members of the Committee [The Attorney-General's Committee on Administrative Procedure] registered a dissent. Their view was that the 'present system or lack of system of judicial review' led to inconsistency and uncertainty. They reported that under a 'prevalent' interpretation of the 'substantial evidence' rule 'if what is called "substantial evidence" is found anywhere in the record to support conclusions of fact, the courts are said to be obliged to sustain the decision without reference to how heavily the countervailing evidence may preponderate— unless indeed the stage of arbitrary decision is reached. Under this interpretation, the courts need to read only one side of the case and, if they find any evidence there, the administrative action is to be sustained and the record to the contrary is to be ignored.' Their view led them to recommend that Congress enact principles of review applicable to all agencies not excepted by unique characteristics. One of these principles was expressed by the formula that judicial review could extend to 'findings, inferences, or conclusions of fact unsupported, upon the whole record, by substantial evidence.' So far as the history of this movement for enlarged review reveals, the phrase 'upon the whole record' makes its first appearance in this recommendation of the minority of the Attorney General's Committee. This evidence of the close

relationship between the phrase and the criticism out of which it arose is important, for the substance of this formula for judicial review found its way into the statute books when Congress with unquestioning—we might even say uncritical—unanimity enacted the Administrative Procedure Act." (Footnotes omitted)

"Entire record" as used in the State Act, and "whole record", as used in the Federal Act, are synonymous.

■ When the legislature adopted A.R.S. § 32–1453G it had knowledge of the extensive research into the problem of judicial review of administrative decisions by Congress and the committees which reported to it. Where the legislature adopts the provisions of a Uniform or Model Act, this court will presume that the legislature acted with knowledge of the construction placed upon the proposed act by its draftsmen, and intended to adopt it. Salt River Val. etc. Assn. v. Peoria Ginning Co., 27 Ariz. 145, 231 P. 415; Arnett v. Clack, 22 Ariz. 409, 417, 198 P. 127, 129; Maestro Music, Inc. v. Rudolph Wurlitzer Company, 88 Ariz. 222, 232, 354 P.2d 266, 273.

The Board furnished the court below with the entire record. The Board, in its brief, in this court, quotes excerpts from that record which it believes support its position. These are the texts of the 4th, 5th and 6th Specifications from the St. Louis County Society's charges, together with summaries of Dr. Clark's testimony with regard to these charges, and a summary of Dr. Cowan's deposition, with regard to Specification 6.

The Board urges that the rule of Davis v. Arizona State Dental Board, 57 Ariz. 255, 112 P.2d 877 limiting review to jurisdictional questions is applicable. The statute regulating the practice of dentistry at the time Davis was decided specifically provided for judicial review in the Superior Court only in the case of the revocation of a license, and then by a writ of certiorari. A.R.S. § 32–1264. Since 1954, however, judicial review of administrative action in the Superior Court, in the absence of special provisions, has been governed by the Administrative Review Act. A.R.S. § 12–901 et seq. The limitations on judicial review in the Superior Court set forth in Davis have been nullified by statute A.R.S. § 12–901 et seq.

The restrictions upon judicial review urged by the Board also disregard the respect we owe to the determination of the learned trial judge. In Webster v. Board of Dental Examiners, 17 Cal.2d 534, 539, 110 P.2d 992, 995, a case in which the revocation of a dentist's license was affirmed, the court said:

"* * * It should be observed here that this is an appeal from a judgment of the superior court denying relief to

the appellant, and upon familiar principles this court need inquire only whether there was evidence of a substantial nature to support the judgment of the court below. [citing cases]. Similarly, where reasonable minds might differ on the inferences to be drawn from a particular set of facts, the appellate court will not substitute its own conclusions for those reached by the trial court. [citing cases]"

See also Universal Camera, supra, 340 U.S. at 490, 71 S.Ct. 456 and National Labor Relations Board v. Pittsburgh Steamship Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479.

■ This court has applied this standard of review of actions of trial judges in the Superior Courts in many other situations and it is applicable to our review of the actions of the trial court under statutes providing for the review of administrative agencies. In Cantlay & Tanzola, Inc. v. Senner, 92 Ariz. 63, 66, 373 P.2d 370, 372, a case involving the review of a Corporation Commission order, we said:

"We have repeatedly held that we will not disturb the findings and judgment of the trial court when supported by substantial evidence, and that all the evidence and inferences therefrom must be reviewed by this court in the light most favorable to sustain the judgment of the lower court. Bohm-

falk v. Vaughan, 89 Ariz. 33, 357 P.2d 617 (1960).

"However in the very nature of judicial review, this court is not bound by conclusions of law of the trial court as applied to its findings of fact. Combustion Engineering, Inc. v. Arizona State Tax Commission, 91 Ariz. 253, 371 P.2d 879 (1962)."

The Board considered 10 Specifications. On this appeal an attempt is made to justify only three of these. In examining those portions of the record which have been brought before us, we find evidence was offered to support the Board's decision only with regard to Specification 6. This evidence is Dr. Cowan's deposition. The Specification charges "unethical conduct of a minor degree." It brings three separate charges of seeing the patients of Dr. Cowan without his permission and makes a fourth charge of giving a patient inadequate care.

With regard to the charge in Specification 6(a), Dr. Cowan testified in his deposition that he did not give Dr. Clark permission to see this patient. Dr. Clark testified that he had been told by the floor nurse that Dr. Cowan had given his permission. Dr. McNally, a member of the Arizona Board, asked Dr. Clark:

"DR. McNALLY: Now, you were never presented with these facts at any grievance committee?

"DR. CLARK: I was never told about these things until these charges were submitted to me in this manner here. Now, one would think that these things, if there's anything of a controversial nature, that I should have at least been presented with these things to offer some sort of an answer because then I could have gotten that nurse down on the floor and made her give her testimony. But I had no defense, don't you see?"

We cannot say the trial judge erred in his evaluation of the evidence in finding that this portion of the record does not show guilt of unprofessional conduct.

Specification 6(b) charges Dr. Clark with having told the wife of one of Dr. Cowan's patients not to consent to electric shock treatment for her husband. Dr. Clark categorically denied this charge. Dr. Cowan testified in his deposition that a nurse had told him that the wife of the patient said Dr. Clark told her not to sign the authorization. In its brief in this court the Board does not rely on this incident.

Specification 6(c) was barred by the Statute of Limitations.

Specification 6(d) charges Dr. Clark with giving a patient inadequate care. Dr. Cowan testified:

"I checked her chart because the charge nurse reported to me that this patient was quite disturbed, and it was her feeling that patient was not getting adequate treatment. Therefore, I checked her chart on June 12, 1958, following which I wrote an informal note which I clipped to the chart asking Doctor Clark that he should request psychiatric consultation."

Dr. Clark testified that this charge was a "complete falsehood". Dr. Clark said:

"* * * I had already requested psychiatric consultation on this patient and if he had looked on the other page in there he would have seen it."

* * * * * *

"* * * It had a very simple explanation. If I had an opportunity to simply sit down with a few people and get the charts out—Prior to all this, it would've been obvious."

Specification 4 charged Dr. Clark with performing certain operations for which he did not have hospital privileges. He did perform the operations. Dr. Clark testified he was never notified that he could not perform these operations. The testimony was:

"MR. HAYES: You were never notified that you couldn't?

"DR. CLARK: I was never notified that I couldn't perform these—that this particular procedure was not within my privileges. I might add, as far as proctoscopic and rectal biopsies were concerned, I'm sure the average practi-

tioner is qualified to do these in his office; I know that I did several of them weekly."

The testimony does not show what hospital privileges Dr. Clark had, who granted these privileges, or what inference of lack of competence might be drawn from the lack of these privileges, if in fact he did lack them. The trial judge did not find this testimony to be substantial evidence to support the charge of professional misconduct and we cannot say that he was in error.

The patient involved in Specification 5 died. She was an emergency patient Dr. Clark had attended on previous occasions. After the patient's death, Dr. Clark filled out certain forms and reports on the basis of the charts and information received from interns. It is not contended that any of the information put on these forms was incorrect. The Board's argument is that only the physician who actually examined and attended the patient should fill out these forms. Dr. Clark testified:

"Any dire concern that I had was essentially allayed by the fact that her clinic tests were essentially normal, her blood sugar had come down to 200 and the patient was responding well. These things were all in the nurses' notes. Consequently, as I say, I was just about to come down, in fact, I had gone home to have a bite to eat, I hadn't had anything since early that morning and my wife had a hot meal for me because it was such a miserable night and so on. I ate my dinner and I was just about to leave when the phone rang. They told me that they had seen the patient twenty minutes before and she was responding nicely, everything appeared to be perfectly normal and the nurse walked into the room and she had expired." * * *

"All I did, as you well know, that any patient that is admitted into a hospital, an approved institution, has to have some record in there and the information that the intern had given me and so forth and what I'd known about her previously was about all I could put into the chart, which I did."

At most, the trial judge had before him a difference of opinion with regard to hospital record keeping. The testimony was undisputed that everything that could be done for the patient was done by the members of the hospital staff who were present when she was brought in and who were in touch with Dr. Clark by telephone. The records were not falsified by Dr. Clark in any way and there was no showing that the signing of the form was unlawful.

▇ In all three Specifications now relied on by the Board, the unprofessional conduct charged relates to alleged violations of the rules of the St. Louis County Medical Society, or a Duluth Hospital, or the Prin-

ciples of Medical Ethics of the American Medical Association, particularly Sections 3, 5 and 10 [3] thereof, which are quoted in the Board's brief. The evidence submitted to us does not show any clear violation of these sections of the Principles of Medical Ethics of the American Medical Association. More important, as applied in the licensing and revocation cases "unprofessional conduct" has been construed to include serious offense, such as intentional violations of law or recognized professional standards. In Aiton v. Board of Medical Examiners, 13 Ariz. 354, 114 P. 962 (1911), the first Arizona case upholding a statute regulating the practice of medicine, the court gave "unprofessional conduct" a restricted meaning in order to avoid the contention that the phrase was unconstitutionally vague. The definition in Aiton has been superseded by the statutory definition in A.R.S. § 32–1401 quoted above. Fitzpatrick v. Board of Medical Examiners, 96 Ariz. 309, 394 P.2d 423. "Unprofessional conduct" cannot be given any definition which would make it subject to constitution-

al attack on grounds of vagueness. State Board of Technical Registration v. McDaniel, 84 Ariz. 223, 232, 326 P.2d 348, 352; State v. Gee, 73 Ariz. 47, 54, 236 P.2d 1029, 1034.

In Fitzpatrick we quoted with approval from State ex rel. Williams v. Whitman, 116 Fla. 196, 150 So. 136, 156 So. 705, 95 A.L.R. 1416, where the court said that there must be a "conscious and culpable act amounting to a willful design to do that which is denounced as an unlawful professional practice." In Aiton we said, quoting from State ex rel. Hathaway v. State Board of Health, 103 Mo. 22, 15 S.W. 322, 323:

"The Board of Health has no right to prescribe a code of medical ethics, and then declare a breach of that code unprofessional and dishonorable conduct; * * *." Aiton v. Board of Medical Examiners, 13 Ariz. at 360, 114 P. at 963.

Still less has the St. Louis County (Minn.) Medical Society any right to prescribe a code of ethics for the state.

---

3. "Section 3.—A physician should practice a method of healing founded on a scientific basis; and he should not voluntarily associate professionally with anyone who violates this principle."
"Section 5.—A physician may choose whom he will serve. In an emergency, however, he should render service to the best of his ability. Having undertaken the care of a patient, he may not neglect him; and unless he has been discharged he may discontinue his services only after giving adequate notice. He should not solicit patients."
"Section 10.—The honored ideals of the medical profession imply that the responsibilities of the physician extend not only to the individual, but also to society where these responsibilities deserve his interest and participation in activities which have the purpose of improving both the health and the well-being of the individual and the community."

It is apparent to us that the evidence is not sufficient under A.R.S. § 32–1452G to support the charge of unprofessional conduct made by these Specifications, and the trial judge was correct in so finding. As Senator Taft said in explaining the section of the Federal Administrative Procedure Act which is comparable to the Arizona statute imposing the duty of judicial review of decisions of the Board of Medical Examiners upon the Superior Court:

"In the first place, the evidence must be substantial; in the second place, it must still look substantial when viewed in the light of the entire record. That does not go so far as saying that a decision can be reversed on the weight of the evidence. It does not go quite so far as the power given to a circuit court of appeals to review a district-court decision, but it goes a great deal further than the present law, and gives the court greater opportunity to reverse an obviously unjust decision * * *." [4]

The trial judge here properly applied the standards of modern judicial review to reverse an unjust decision of the Board.

Affirmed.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and UDALL and McFARLAND, JJ., concur.

4. Quoted with approval in Universal Camera, supra, 340 U.S. at page 485, 71 S.Ct. at page 463.