387 P.2d 809

**WARREN TRADING POST COMPANY, a Corporation, Appellant,**

v.

**Thad M. MOORE, Warren Peterson and W. E. Stanford, as members of the Arizona State Tax Commission, and the Arizona State Tax Commission, Appellees.**

No. 7026.

Supreme Court of Arizona,

En Banc.

Dec. 4, 1963.

Rehearing Denied Jan. 7, 1964.

Snell & Wilmer, Perry M. Ling, Phoenix, for appellant.

Wade Church, former Atty. Gen., Robert W. Pickrell, Atty. Gen., and Leslie C. Hardy, former Chief Asst. Atty. Gen., Phoenix, for appellees.

Norman M. Littell, Washington, D. C., Joseph F. McPherson and Spencer K. Johnston, Window Rock, for Navajo Tribe of Indians, as amicus curiae.

STRUCKMEYER, Justice.

Appellant, Warren Trading Post Company, appeals from a judgment determining that certain taxes are due to the State of Arizona by reason of retail sales of personal

property to reservation Indians residing on the Navajo Indian Reservation.[1]

The Arizona exaction arises out of the provisions of the Arizona Privilege Transaction Act, A.R.S. § 42–1308, requiring every person within Arizona[2] who receives gross proceeds of sale or gross income from sales to acquire a license for a fee of $1.00. A.R.S. § 42–1312 imposes a tax measured by an amount equal to 2% of the gross proceeds of sales or gross income on the privilege of selling any tangible personal property at retail.[3]

In considering collectively the arguments presented, we observe certain conclusions which weigh heavily in the decision.

 Tax immunity is never enjoyed as a matter of right but only as an incidental windfall when, and only as long as, imposition of the state tax impairs or interferes with the exercise of a federal function. Petition of S. R. A., Inc. v. State of Minnesota, 219 Minn. 493, 18 N.W.2d 442, affirmed 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851. The immunity here claimed represents a severe impairment of the taxing power of Arizona. It is one we would not be disposed to sustain unless we entertained grave doubts but that a federal function was impaired.

 We have repeatedly held that this tax is on the privilege or right to engage in business and is not a sales tax although generally referred to as such, that it neither imposes a tax on the purchaser nor upon sales but rather taxes the seller for the privilege of engaging in business, that the tax is the direct obligation of the retailer and not that of the consumer, and further that there is no statutory authority for the retailer to attempt to constitute himself an

1. Appellant, a domestic corporation, licensed as an Indian trader by the Commissioner of Indian Affairs under Act of Congress, 22 Stat. 179, 25 U.S.C. §§ 261, 264, is authorized by Article III of its Articles of Incorporation to, among other things: (a) Buy, own, hold, sell, barter, pledge, hypothecate cattle and other livestock and in general to conduct and carry on a ranch and livestock business. (b) Deal in cattle and property. (c) Lend money. (d) Deal in shares of stock, bonds, promissory notes. (f) Buy, sell, hold and lease or construct reservoirs, canals, dams. (i) Carry on the business of purchasing, manufacturing, producing, selling, and dealing in goods and wares, merchandise and materials of every kind. (m) Maintain in addition to its principal office at Flagstaff, Arizona, one or more offices for the transactions of its business either within or without the State of Arizona.

2. Indian reservations are within the political, governmental and geographical boundaries of Arizona. Enabling Act, § 20(2), A.R.S.; Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419; Harrison v. Laveen, 67 Ariz. 337, 196 P. 2d 456; Porter v. Hall, 34 Ariz. 308, 271 P. 411.

3. The stipulation as to facts in the lower court specifically confined the question to taxes on sales to reservation Indians who reside on an Indian reservation. We assume that taxes arising out of sales to others on the Navajo Reservation have been paid and therefore the right of the state to levy and collect such taxes is not questioned.

agent of the state for the purpose of receiving the tax and transmitting it to the state. The legal incidence of the tax falls upon the seller and not upon the buyer.[4] Arizona State Tax Commission v. Garrett Corp., 79 Ariz. 389, 291 P.2d 208; State Tax Commission v. Quebedeaux Chevrolet, 71 Ariz. 280, 226 P.2d 549.

 Were appellant an instrumentality of the United States Government by reason of its being licensed to do business with the Indians under the appropriate acts of Congress,[5] no exemption is to be implied.[6] Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615. Exemption of the person upon whom the legal incidence of the tax falls is not to be implied regardless of the fact that the burden is passed on so long as Congress has not expressly exempted such person, Esso Standard Oil Co. v. Evans, 345 U.S. 495, 73 S.Ct. 800, 97 L.Ed. 1174. We conclude that the Navajo Indian Tribe, Amicus Curiae, is not entitled to assert a greater immunity from non-discriminatory taxation for traders with whom its members deal than the United States for its employees, contractees or other chosen agents, even were we certain that the economic burden must inevitably be shifted to the Indians.[7]

 The Arizona exaction is non-discriminatory. It is not levied against Indians or Indian tribes as such but against all who engage in the business of selling within the geographical boundaries of the State of Arizona. The fact of legal title in the United States to the Indian lands is not sufficient to effect an exclusion of the state

---

4. The determination of the incidence of the tax by the state court is controllling, Federal Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 62 S.Ct. 1, 86 L.Ed. 65, absent facts or construction upon which Federal Constitutional issues rest. Kern-Limerick v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546.

5. The Navajo Tribe of Indians, Amicus Curiae, asserts that the Warren Trading Post Company is not a federal instrumentality.

6. Appellant, as a licensee of the federal government, can scarcely claim a better position as an instrumentality by which the government accomplishes its purposes than an employee of the federal government, Graves v. New York, ex rel. O'Keefe, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927; or a contractee, James v. Dravo Contracting Co., 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155. See Alward v. Johnson, 282 U.S. 509, 51 S.Ct. 273, 75 L.Ed. 496, 75 A.L.R. 9.

7. "* * * we cannot assume that Congress will choose to aid the Indians by permanently granting them immunity from taxes which they are as able as other citizens to pay. It runs counter to any traditional concept of the guardian and ward relationship to suppose that a ward should be exempted from taxation by the nature of his status, and the fact that the federal government is the guardian of its Indian ward is no reason, by itself, why a state should be precluded from taxing the estate of the Indian." Oklahoma Tax Commission v. United States, 319 U.S. 598, 607, 63 S.Ct. 1284, 1288, 87 L.Ed. 1612. ·There·is no suggestion arising out of the stipulated facts that the Indians are less able to pay this tax than other residents of Arizona of a like or similar economic status.

from excise taxes unless it appears that the state by consent or cession has transferred to the United States that residuum of jurisdiction which otherwise it would be free to exercise.[8] Silas Mason Co. v. Tax Commission of Washington, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187. The authority of the state may rightfully extend to all matters not interfering with the Indian's protection by the government. Utah & Northern R. Co. v. Fisher, 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542. The applicability of state law depends upon "whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251, reversing Williams v. Lee, 83 Ariz. 241, 319 P.2d 998.

Historically three powers of the federal government have been used to support congressional action in legislating on Indian affairs. The War Making Power was invoked by the First Congress on August 7th, 1789, by entrusting Indian affairs to the War Department. 1 Stat. 49, 50. It was

the practice and policy of the federal government during the many years of tension between Indian and non-Indian to negotiate with the tribes and to settle differences by treaty if possible. See Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483. After the Civil War, it was recognized that assimilation not segregation of the Indians was necessary [9] and the use of the Treaty Making Power to deal with Indians as dependent alien nationalities was terminated by Congress in 1871. One of the last treaties was entered into with the Navajo Indians in 1868. Cohen, Federal Indian Law, 24, 210. For a more detailed background of the Navajo Tribe see Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed. 2d 251, supra.[10] Neither appellant nor Amicus Curiae, the Navajo Indian Tribe, assert a tax immunity arising out of or supported by the terms of the Navajo Treaty with the United States.

In 1886 the Supreme Court of the United States examined a congressional enactment prescribing criminal laws for Indians living on reservations. In sustaining the plenary

---

8. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S.Const. amend. X.

9. See for further changes in the policy of Congress, Organized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed. 2d 573.

10. "There are many cases * * * recognizing that the plenary power of Congress over the Indian Tribes and tribal property cannot be limited by treaties so

as to prevent repeal or amendment by a later statute. The Tribes have been regarded as dependent nations, and treaties with them have been looked upon not as contracts, but as public laws which could be abrogated at the will of the United States." Choate v. Trapp, 224 U.S. 665, 670, 671, 32 S.Ct. 565, 56 L.Ed. 941. Treaty rights would, of course, pre-empt those areas affected thereby and would require congressional sanctions before effective state action.

power of Congress to act in behalf of the Indians, the court said:

"From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power." United States v. Kagama, 118 U.S. 375, 384, 6 S.Ct. 1109, 30 L.Ed. 228.

Since then, the recognized relation of tribal Indians together with the commerce clause of the U.S.Const., art. 1, § 8(3), granting to Congress the power "to regulate commerce with * * * the Indian tribes" have been treated as the sources of congressional power, see Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251, supra, Perrin v. United States, 232 U.S. 478, 34 S.Ct. 387, 58 L.Ed. 691, Johnson v. Gearlds, 234 U.S. 422, 34 S.Ct. 794, 58 L.Ed. 1383, without always pointing specifically to either.

■ We do not doubt the plenary power of Congress to legislate in behalf of its wards by providing for them such federal services as education, health and reclamation, or that Congress may permit tribal self-government. The exercise of state jurisdiction may not impede the federal government in the treatment of its wards nor may it undermine the authority of the tribe in the exercise of self-government, Williams v. Lee, supra. Neither may it impair

a right granted or reserved by federal law. Organized Village of Kake v. Egan, supra. Otherwise state laws may be applied to Indians.

■ Congress has customarily carved out reservations from the unreserved public domain lying within the geographical boundaries of the state either to be owned or held by the Indian tribes. Utah & Northern R. Co. v. Fisher, 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542, supra. State law consistent with congressional legislation in behalf of its wards and with the tribal self-government is not excluded on these reservations.

"It is not unusual for the United States to own within a state lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the state. On the contrary, the lands remain part of her territory and within the operation of her laws, save that the latter cannot affect the title of the United States or embarrass it in using the lands or interfere with its right of disposal.

"A typical illustration is found in the usual Indian reservation set apart within a state as a place where the United States may care for its Indian wards and lead them into habits and ways of civilized life. Such reservations are part of the state within which they lie,

and her laws, civil and criminal, have the same force therein as elsewhere within her limits, save that they can have only restricted application to the Indian wards. * * *" Surplus Trading Co. v. Cook, 281 U.S. 647, 650, 651, 50 S.Ct. 455, 74 L.Ed. 1091.

Generally, it may be said that state laws apply to the extent they do not conflict with federal Indian laws.

"Enactments of the federal government passed to protect and guard its Indian wards only affect the operation, within the colony [or reservation], of such state laws as *conflict* with the federal enactments." United States v. McGowan, 302 U.S. 535, 539, 58 S.Ct. 286, 82 L.Ed. 410, (Emphasis supplied).[11]

We do not find that Arizona by taxing appellant interferes with the United States in the use of reservation lands for the purposes for which they were established or that its tax tends to thwart the purpose of the federal government in caring for its Indian wards and leading them into the habits and ways of civilized life.

 This brings us to the ultimate proposition advanced by the Navajo Indian Tribe that the commerce clause of the federal constitution by its own force creates an area of trade free from interference by

the state. There is here equated the power to regulate commerce among the several states with the Indian tribes in the argument that the states are not allowed "one single—tax—worth of direct interference with the free flow of commerce." But we do not understand that the commerce clause provides an automatic pre-emption to the federal government of every area wherein conceivably Congress might act.

 If there is an analogy to be drawn from the interstate commerce clause, still the possession of power in Congress does not exclude all state power. Southern Pac. Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915. A state may legislate freely upon those phases of commerce which are left unregulated by the nation and if the prohibition of state action is only inferable from the scope and purpose of the federal legislation, it must be clear that state action is inconsistent with the federal provisions. Cloverleaf Butter Co. v. Patterson, 315 U.S. 148, 62 S.Ct. 491, 86 L.Ed. 754. Local authorities are not foreclosed from regulating matters of local concern merely because there may be some incidental but not burdensome effect on interstate commerce. California v. Zook, 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005; Cooley v. Board of Wardens, 12 How. 299, 13 L.Ed. 996.

---

11. See also New York ex rel. Ray v. Martin, 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261; Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419, supra. Note too United States v. McBratney, 104 U.S. 621, 26 L.Ed. 869.

■ This brings us to the further assertion that the federal statutes on trading with Indians pre-empt the field of sales to Indians upon the Navajo Indian Reservation as against the Arizona Transaction Privilege Tax. By act of August 15, 1876, 25 U.S.C. § 261, Congress provided that:

"The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians."

and by § 262:

"Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians."

■ It is argued that if appellant "proved his fitness to trade with the Indians to the satisfaction of the Commissioner of Indian Affairs and secured a license from the Commissioner, he would thereupon have the right, whether or not he applied for or received a Transaction Privilege Tax License from the defendants [members of the State Tax Commission], to set up as a trader on the Navajo Indian Reservation." But we do not think it follows because appellant is licensed by the Commissioner of Indian Affairs to engage in trade that he has also been commissioned to disregard state laws. Rather, we would think that the Commissioner of Indian Affairs in considering whether a trader is a "proper person" would consider whether he will or has complied with such state laws as are constitutionally consistent with the licensee's business.

By the Arizona Enabling Act, § 20, 36 Stat. 557, 568, the people of this state agreed with the United States to forever disclaim all right and title to all lands lying within Arizona's boundaries owned or held by any Indian or Indian tribes and that "* * * until the *title* of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States." Absolute jurisdiction does not mean invariably exclusive jurisdiction; the word "absolute" carries the meaning of undiminished not exclusive. Organized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573.

The same section of the enabling act further provides that "* * * all such lands shall be exempt from taxation by said State so long and to such extent as Congress has prescribed or may hereafter pre-

scribe." The taxation here forbidden is that of reservation lands. There is no general ceding of the taxation authority of the state. Congress has not provided non-taxability from excises although it could have.

"If Congress intends to prevent the State of Oklahoma from levying a general non-discriminatory estate tax applying alike to all its citizens, it should say so in plain words. Such a conclusion can not rest on dubious inferences." Oklahoma Tax Commission v. United States, 319 U.S. 598, 607, 63 S.Ct. 1284, 87 L.Ed. 1612, supra.

Moreover, any inference that this trader was intended by Congress to be relieved of the Arizona general non-discriminatory privilege transaction tax is to the contrary. By 61 Stat. 644, 4 U.S.C. §§ 105, 109, Congress authorized the states to extend sales taxes to persons residing on or carrying on their businesses and to transactions occurring in federal areas. While Congress specifically excluded Indians "not otherwise taxed," it did not purport to protect those who trade with Indians from taxation.[12]

We restate our basic conclusions.

First, assuming that appellant is an instrumentality of the United States government, no immunity from the tax will be implied.

Second, the test of state action irrespective of the sources of power is that state action must not be inconsistent with or burdensome to federal purposes or laws.

Under the stipulated facts of this case we hold that the Arizona exaction as applied to the appellant does not thwart the will of Congress in its treatment of its Indian wards nor is it inconsistent with the power of Congress to regulate trade with the Indian tribes.

The judgment of the court below is affirmed.

BERNSTEIN, C. J., UDALL, Vice C. J., and JENNINGS, J., concur.

LOCKWOOD, Justice (dissenting).

Chief Justice Waite has defined the judicial function in Minor v. Happersett, 21 Wall. 162 at 178, 22 L.Ed. 627 (1874):

"Our province is to decide what the law is, not to declare what it should be * * *. If the law is wrong, it ought to be changed; but the power for that is not with us."

In this case, I am convinced the majority of the Court misconceives·what the law is in its concern over what the law in strict

---

12. We are not called upon to determine precisely the meaning of the language used by Congress. It is sufficient to say that Congress could have excluded appellant from the scope of the Arizona tax. But it did not.

**120**

justice should be. The efforts of the federal government to protect the Indians may too long have held them as quasi-citizens living apart and lagging behind the rest of the nation in both privileges and proportionate responsibilities. Congress may have continued to hold too tightly its reins of control over commerce with tribal Indians. It may be that the system of favored "Indian traders" under license and control of the Commissioner of Indian Affairs is an anachronism in our modern economy. But it is not the function of this Court to change federal Indian policy. We should interpret, not amend the existing federal law and, on that basis, we should invalidate the tax in this case. In my opinion, Arizona lacks the power to impose a tax on the privilege of conducting commerce with the Indians—an area of commerce delegated exclusively to the federal government in the Commerce Clause and a privilege granted solely by the Commissioner of Indian Affairs under 25 U.S.C. § 262.

Before examining the relation between this privilege tax [1] and the Commerce Clause, the character of the problem in this case needs to be more sharply focused. The majority treats this as an "exemption" case and, consequently, interprets strictly against the taxpayer. This is wrong. No exemption for an Indian trader exists in Arizona statutes; the appellant admits this. This case involves the *scope* of the Arizona privilege tax. While taxing power is inherent in the sovereign states, the states

1. The following sections dealing with the transaction privilege tax are pertinent to this case. A.R.S. § 42–1308 provides in part: "A. Every person who receives gross proceeds of sales or gross income upon which a privilege tax is imposed by this article, desiring to engage or continue in business, shall make application to the [Arizona state tax] commission for a privilege license accompanied by a fee of one dollar. Such a person shall not engage or continue in business until he has obtained a privilege license." * * * "F. A person who violates any provision of this section is guilty of a misdemeanor punishable by a fine for each offense of not less than ten dollars, or by imprisonment for not less than ten days." [As amended, Laws 1956, Ch. 98, § 1.] Section 42–1309, in part reads: "A. There is levied and there shall be collected by the commission for the purpose of raising public money to be used in liquidating the outstanding obligations of the state and county governments, to aid in defraying the necessary and ordinary expenses of the state and the counties, to reduce or eliminate the annual tax levy on property for state and county purposes, and to reduce the levy on property for public school education, annual privilege taxes measured by the amount or volume of business transacted by persons on account of their business activities * * *." And A.R.S. § 42–1312 reads as follows: "A. The tax imposed by subsection A of § 42–1309 shall be levied and collected at an amount equal to two per cent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the business of selling any tangible personal property whatever at retail * * *." Moreover, any person against whom this tax is levied may be enjoined from continuing in business until he has complied with the statute. A.R.S. § 42–1334.

delegated certain taxing powers to the federal government in the Commerce Clause.[2] Therefore in this case, we must determine whether the tax commission has trespassed upon an area of commerce delegated to the federal government.

Consequently, for the purpose of determining the scope of this tax, we should observe established rules of construction. First, when construing the ambit of a tax, as opposed to an exception to a tax, this Court has traditionally interpreted favorably to the taxpayer and strictly against the tax commission. Alvord v. State Tax Commission, 69 Ariz. 287, 213 P.2d 363 (1950). In addition, since 1935 when the Twelfth Legislature adopted this tax until 1956 when the tax commission issued Regulation 2.18.5 taxing Indian traders, the commission in administering the law had not construed the tax statute as including Indian traders. Although long administrative interpretation is not controlling,

the courts give weight to such an interpretation when construing the law. Alvord v. State Tax Commission, supra; Van Veen v. County of Graham, 13 Ariz. 167, 108 P. 252 (1910). And in cases concerning possible exercise of power by states over Indian affairs, the Supreme Court of the United States, on the basis of the Commerce Clause, appears to have raised a presumption against such state action. See, e. g., Williams v. Lee, 358 U.S. 217, 220–221, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); Organized Village of Kake v. Egan, 369 U.S. 60, 74–76, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962); and Worcester v. Georgia, 6 Pet. 515, 561, 8 L.Ed. 483 (1832), Chief Justice Marshall's great decision which first announced this principle.

The all-important subject of this case is the relation between the Commerce Clause and the Arizona privilege tax. The Commerce Clause delegates to the federal government the power to control three

2. The states delegated to the federal government the exclusive power to tax the privilege of trading with Indians. Regarding another trade area included within the Commerce Clause, the United States Supreme Court stated in Spector Motor Service v. O'Connor, 340 U.S. 602, at 608, 71 S.Ct. 508, at 511, 95 L.Ed. 573 (1951): "Taxing power is inherent in sovereign states, yet the states of the United States have divided their taxing power between the Federal Government and themselves. They delegated to the United States the exclusive power to tax the privilege to engage in interstate commerce when they gave Congress the power 'To regulate Commerce with for-

eign Nations, and among the several States, [and with the Indian Tribes].' U.S.Const. Art. 1, § 8, cl. 3. While the reach of the reserved taxing power of a state is great, the constitutional separation of the federal and state powers makes it essential that no state be permitted to exercise, without authority from Congress, those functions which it has delegated exclusively to Congress." Hence, the statement in the majority opinion that, by the language of the Enabling Act and the Arizona Constitution, Arizona ceded only the power to tax reservation lands is misleading. This statement ignores the division of taxing power in the federal constitution.

trade areas: interstate, foreign, and Indian commerce. This congressional power over Indians has been described as a power as broad as that to regulate foreign commerce,[3] and broader than that to regulate interstate commerce.[4] Indeed, this federal power over Indians may justifiably be characterized as plenary.[5]

Each trade area in the Commerce Clause may have been delegated to the federal government for a different reason. But a principle common to all three trade areas emerges from the Commerce Clause. A long line of "interstate commerce" and "foreign commerce" cases reveals a prohibition which applies equally to this "In-

dian commerce" case: A state cannot tax the privilege of engaging in an area of trade delegated exclusively to the federal government in the Commerce Clause.

Historically, a tax phrased in terms of a privilege for engaging in interstate commerce has been considered beyond the power of the states.[6] *Any* such tax "burdens" interstate commerce. Alpha Portland Cement Co. v. Massachusetts, 268 U.S. 203, 217, 45 S.Ct. 477, 69 L.Ed. 916 (1925). Two recent cases restating this position that the Commerce Clause completely protects interstate commerce from state privilege taxes are Spector Motor Service v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95

3. United States v. Forty-Three Gallons of Whiskey, 93 U.S. 188, at 194, 23 L.Ed. 846 (1876), where the Supreme Court declared: "Under the articles of confederation the United States had the power of regulating the trade and managing all affairs with the Indians not members of any of the States; provided that legislative right of a State within its own limits be not infringed or violated. [Article IX, Articles of Confederation.] Of necessity, these limitations rendered the power of no practical value. This was seen by the convention which framed the Constitution; and Congress now has the exclusive and absolute power to regulate commerce with the Indian tribes, —*a power as broad and as free from restrictions as that to regulate commerce with foreign nations.*" (Emphasis added.)

4. See 1 Ops.Att'y Gen. 645 (1824); 1 Willoughby on the Constitution of the United States, 2d ed., § 226, p. 397; Story on the Constitution of the United States, § 1097; and, especially, Prentice and Egan, The Commerce Clause of the Federal Constitution, p. 342 (1898): "The

purpose with which this power was given to Congress was not merely to prevent burdensome, conflicting or discriminating State legislation, but to prevent fraud and injustice upon the frontier, to protect an uncivilized people from wrongs by unscrupulous whites, and to guard the white population from the danger of savage outbreaks. A grant made with such a purpose must convey a different power from one whose purpose was to insure the freedom of commerce. Congress has, in the case of the Indians, prohibited trade in certain articles, it has limited the right to trade to persons licensed under Federal laws, and in many ways asserted a greater control than would be possible over other branches of commerce."

5. Worcester v. Georgia, supra; Willoughby, supra, pp. 379–402, 1327, 1328.

6. The tax involved in the instant case has also been phrased in terms of a tax on the privilege of engaging in business. See A.R.S. § 42–1308 and Arizona State Tax Commission v. Garrett Corp., 79 Ariz. 389, 291 P.2d 208 (1955).

.L.Ed. 573 (1951) and Memphis Steam Laundry Cleaner, Inc. v. Stone, 342 U.S. .389, 72 S.Ct. 424, 96 L.Ed. 436 (1952). A state has no power to tax the privilege of doing interstate commerce because it is a privilege granted by the federal, not the ·state government.

The United States Supreme Court has not only forbidden a state privilege tax as .a condition precedent to the beginning of an interstate business, but it also has denied the power of a state to impose a tax ·on the privilege of doing an exclusively interstate business after the business has begun. Such taxes have been struck down ·even though they were fairly measured .according to the connections of a taxpayer ·with the taxing state. In Spector Motor, for example, the Supreme Court invalidated a Connecticut privilege tax imposed on an interstate trucking corporation and said 340 U.S. at 609, 71 S.Ct. at 512, 95 L.Ed. 573:

> "This Court heretofore has struck down, under the Commerce Clause, state taxes upon the privilege of carrying on a business that was exclusively interstate in character. The constitutional infirmity of such a tax persists no matter how fairly it is apportioned to business done within the state."

See also, Alpha Portland Cement Co. v. Massachusetts, supra; Memphis Steam Laundry Cleaner, Inc. v. Stone, supra; Ozark Pipe Line Corp. v. Monier, 266 U. S. 555, 45 S.Ct. 184, 69 L.Ed. 439 (1925).

The United States Supreme Court has repeatedly invalidated a state tax phrased in terms of a privilege for engaging in interstate commerce. This Court recognized this prohibition against such a tax in Combustion Engineering, Inc. v. Arizona State Tax Commission, 91 Ariz. 253, 371 P.2d 879 (1962). The United States Supreme Court has also struck down state taxes on the privilege of doing foreign commerce. Brown v. Maryland, 12 Wheat. 419, 6 L.Ed. 678 (1827), for example, concerned a Maryland tax imposed on a foreign importer. The Court invalidated the tax on alternative grounds: the Import-Export Clause [7] and the Commerce Clause. Discussing the impact of thé Commerce Clause on the state tax, the Court said 12 Wheat. at 447, 6 L.Ed. 678:

> "Congress has a right, not only to authorize importation, but to authorize the importer to sell * * *. The power claimed by the State [of Maryland] is, in its nature, in conflict with that given to Congress; and the greater or less extent in which it may be exercised does not enter into the inquiry concerning its existence."

7. U.S.Constitution, Article 1, § 10, Clause 2.

See also Crew Levick Company v. Pennsylvania, 245 U.S. 292, 38 S.Ct. 126, 62 L.Ed. 295 (1917).[8]

Although no court before this has ruled on the validity of a state tax which is imposed on the privilege of doing business with the Indians, the principle prohibiting such a tax on interstate and foreign commerce should also apply to this case. Certainly the Indian trader here is no less favored by the Commerce Clause than is the interstate trucker in Spector Motor and the foreign importer in Brown. From the Commerce Clause emerges a principle forbidding a state tax on the privilege of engaging in an area of trade delegated exclusively to the federal government. Consequently, in my opinion, this privilege tax is invalid when imposed on a federal Indian trader. Arizona has no power to tax the privilege of doing business with the Indians because it is a privilege granted solely by the federal government.

Indeed, this prohibition arising from the Commerce Clause applies with greater force in the area of Indian commerce

than in the other two trade areas. First, as opposed to interstate and foreign commerce, doing business with the Indians is a privilege conditionally granted by the federal government, not an individual right. While any person may engage in interstate and foreign commerce in the absence of regulations to the contrary, no one may sell to Indians unless licensed and rigorously regulated by the Commissioner of Indian Affairs.

Secondly, we have here a stronger case against a state privilege tax than in the case of foreign or interstate commerce because Congress has more fully occupied and regulated the area of Indian commerce. The federal government, for example, neither grants nor regulates the privilege of engaging in interstate commerce in the manner it grants and regulates the privilege of engaging in Indian commerce. Under the present law, the Commissioner of Indian Affairs has the exclusive power to regulate the kind, quality and price of the goods sold to the Indians. 25 U.S.C.A. §§ 261–264.[9] Implied prohibitions from the

---

8. Richfield Oil Corp. v. State Board of Equalization, 329 U.S. 69, 75, 67 S.Ct. 156, 91 L.Ed. 80 (1946), cites Brown and Crew Levick with approval, although the Richfield decision was based on the Import-Export Clause.

9. § 261 *"Power to appoint traders with Indians.* The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quan-

tity of goods and the prices at which such goods shall be sold to the Indians. Aug. 15, 1876, c. 289, § 5, 19 Stat. 200.

§ 262 *"Persons permitted to trade with Indians.* Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules

Commerce Clause set certain minimum conditions for engaging in interstate and foreign commerce. For Indian commerce, however, we have not only the implied prohibitions from the Commerce Clause, but a complete set of federal regulations which does everything except expressly prohibit this tax.[10]

Even so, the majority in this case, cites language from Oklahoma Tax Commission v. United States, 319 U.S. 598, 607, 63 S. Ct. 1284, 87 L.Ed. 1612 (1943), an estate tax case, and concludes: "Congress has not provided non-taxability [of Indian traders] from excises although it could have." As we have seen, the majority persists in treating this as an "exemption" case and in construing strictly against the taxpayer. Consequently, to support its position, the majority uses language from Oklahoma Tax Commission,[11] an "exemption" case. But this is a "scope" case; it concerns the am-

and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians. Mar. 3, 1901, c. 832, § 1, 31 Stat. 1066; Mar. 3, 1903, c. 994, § 10, 32 Stat. 1009.

§ 263 *"Prohibition of trade by President.* The President is authorized, whenever in his opinion the public interest may require the same, to prohibit the introduction of goods, or of any particular article, into the country belonging to any Indian tribe, and to direct all licenses to trade with such tribe to be revoked, and all applications therefor to be rejected. No trader to any other tribe shall, so long as such prohibition may continue, trade with any Indians of or for the tribe against which such prohibition is issued. R.S. § 2132.

§ 264 *"Trading without license; white persons as clerks.* Any person other than an Indian of the full blood who shall attempt to reside in the Indian country, or on any Indian reservation, as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession, and shall moreover be liable to a penalty of $500 * * *."

10. The set of federal regulations regarding the operation of radio stations also does everything except expressly prohibit such a state tax. In Fisher's Blend Station, Inc. v. Tax Commission of the State of Washington, 297 U.S. 650, 56 S.Ct. 608, 80 L.Ed. 956 (1936), Justice Stone, writing for an unanimous court, invalidated a state occupation tax measured by gross receipts (which is really only another name for a privilege tax) when imposed upon a radio station operating under a federal license. One of the controlling facts was the requirement of the federal license. The act involved in the case, the predecessor of the Federal Communications Act, prohibited "any save licensees to operate broadcasting apparatus." The resemblance of this act to the federal regulation in the instant case, § 261, is apparent.

11. The majority quotes twice from Oklahoma Tax Commission. While some language from that case may superficially appear applicable, it actually has no relevance to the instant case. Not only is Oklahoma Tax Commission an "exemption" case, but Oklahoma Indians are anomalous. The United States Supreme Court recognized this in Oklahoma Tax Commision, 319 U.S. at 604, 63 S.Ct. at 1286–1287, 87 L.Ed. 1612. See also Cohen, Federal Indian Law (1956) 1051. Consequently, a case involving Oklahoma Indians does not necessarily apply to this case involving Navajo Indians. The relation between the Navajo Indians and Arizona differs significantly from the relation between the Oklahoma Indians and Oklahoma. See also Williams v. Lee, supra, 358 U.S. at 222–223, 79 S.Ct. at

bit of the Arizona tax in relation to the powers delegated to the federal government in the Commerce Clause. Therefore, this Court should interpret favorably to the taxpayer. Alvord v. State Tax Commission, supra.

Moreover, the absence of express Congressional prohibition of this tax should not be interpreted as implied consent. At the time the federal regulations were passed, such a tax had never been proposed. In addition, where the power is exclusive, as it is here, the failure of Congress to make express regulations indicates its will that the subject shall be left free from any restriction. Robbins v. Taxing District of Shelby County, 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694 (1886); Philadelphia & S. Mail Steamship Co. v. Pennsylvania, 122 U.S. 326, 7 S.Ct. 1118, 30 L.Ed. 1200 (1886); Leisy v. Hardin, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1889); and In re Rahrer, 140 U.S. 545, 11 S.Ct. 865, 35 L.Ed. 572 (1891). Consequently, the Commerce Clause precludes this tax on appellant, even in the absence of a specific prohibition by Congress.

The majority restates its two basic conclusions at the close of its opinion. The first conclusion regarding no tax exemption

for a federal instrumentality is immaterial; appellant specifically abandoned this "instrumentality" theory during oral argument. The second conclusion has two premises: first, this tax imposed by Arizona is not "inconsistent" and, second, it is not "burdensome" to federal purposes or laws. I will analyze these premises in inverse order.

When determining that this tax does not have a "burdensome effect" on Indian commerce, the majority uses the "local activity" test from California v. Zook, 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005 (1949) and Cooley v. Board of Wardens, 12 How. 299, 13 L.Ed. 996 (1851). This reasoning suffers from what might be termed a "transplanted category." [12] This is what Walter Wheeler Cook warned against when he wrote:

> "The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against." [13]

A test developed for the purpose of protecting the free flow of interstate commerce does not necessarily accomplish the purpose

271–272, 3 L.Ed.2d 251. Arizona has assumed fewer responsibilities than Oklahoma and the Navajo Indians have exercised a greater degree of tribal autonomy than the Oklahoma Indians.

12. For an enlightening discussion of this fallacy, see Hancock, "Fallacy of the Transplanted Category," 37 Can.Bar Rev. 535 (1959).
13. Cook, Logical and Legal Bases of the Conflict of Laws (1942), p. 159 quoted in Hancock, op. cit., p. 575.

of protecting Indian commerce. The "local activity" test of Zook and Cooley has relevance when applied to an interstate commerce problem; Congress wanted to protect the free flow of trade between states, but did not intend to regulate local activities. But this "local activity" test has no relevance when applied to this Indian commerce problem. Formerly, Indians were considered "the wards of the nation." United States v. Thomas, 151 U.S. 577, 14 S.Ct. 426, 38 L.Ed. 276 (1894). Recent decisions have described the role of the federal government in relation to Indians as a protective trusteeship. See, e. g., United States v. McGowan, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938). Congress, therefore, has the duty of regulating commerce with the Indians, even if this commerce appears to be a "local activity" because it takes place wholly within the boundaries of Arizona. Consequently, it is fallacious to reason that this tax does not constitute a burden on Indian commerce just because it is measured by a "local activity." [14] So much for the majority's "burdensome" reasoning.

And when determining that this tax is not "inconsistent" with federal purposes, the majority gives us an interesting history of federal powers and then concludes, without further explanation, that this tax does

not conflict with federal laws. But the Department of the Interior, in a formal opinion by the First Assistant Solicitor, could not have been more clear and more definite in this regard:

"Question has arisen as to how far Indians and persons trading with Indians are subject to the sales taxes imposed by Arizona law. Since the problem is a general one and the Arizona statutes in question are not dissimilar in substance from the sales tax laws of other States and since the subject has been previously covered only in informal memoranda, I have determined to treat the question in a formal opinion.

\* \* \*

"The regulation of trade with Indian tribes is one of the powers expressly delegated to Congress by section 8 of Article I of the United States Constitution. Congress has exercised this power in statutes restricting trade with the Indians and giving exclusive authority to the Commissioner of Indian Affairs to regulate such trade and the prices at which goods shall be sold to the Indians.

\* \* \*

"Where Congress has exercised its authority it is axiomatic that the field

---

14. For the same reasons, we would fallaciously transplant another category if we applied to the instant case the "intrastate transaction" test of International

Harvester Co. v. Department of the Treasury of Indiana, 322 U.S. 340, 64 S. Ct. 1019, 88 L.Ed. 1313 (1944).

is closed to State action. Sperry Oil and Gas Co. v. Chisholm, 264 U.S. 488 [44 S.Ct. 372, 68 L.Ed. 803]. Therefore, persons selling to or buying from Indians on Indian reservations are not subject to State laws which regulate or tax such transactions.

\* \* \*

"Traders on Indian reservations who are non-Indians are, in my opinion, required to take out licenses under the Arizona laws in question to carry on trade with non-Indians on the reservation, and must account to the State authorities for sales taxes on so much of their business as is done with non-Indians. They are not required to account to the State authorities for their transactions with Indians on the reservations, but are, if they do deal with the Indians, required to conform with the licensing provisions in the Federal statutes regulating trade with Indians.

\* \* \*

"The preceding part of this opinion demonstrates that sales to Indians on the reservation are not subject to State taxation and Indian purchasers are not required to pay the additional cost which is added to the price of the article to cover the tax. Such additions to the price of articles by State action are clearly interferences with the authority of the Commissioner of Indian Affairs to regulate the prices at which goods shall be sold to the Indians." 57 Interior Dept. Decisions 124 (May 8, 1940).[15]

An "interference with the authority of the Commissioner of Indian Affairs" is inconsistent with federal purposes and laws. Despite this unequivocal language, the majority opinion audaciously advises the Commissioner of Indian Affairs, when determining whether a trader is a "proper person", to "consider whether he will or has complied with" the imposition of the tax in question. So much for the majority's "inconsistent" reasoning.

The majority opinion refers to 61 Stat. 641, §§ 105 and 109 (commonly referred to as the "Buck Act") as a specific congressional authorization to the states to extend sales taxes to persons residing in or carrying on their business and to transactions occurring in "federal areas." Section 110(e) of the Buck Act defines "federal area":

"The term 'Federal area' means any lands or premises held or acquired by

15. The Arizona statutes permit a seller to "add" the tax to the sale price separately, or to "absorb" it in the specified sale price. Arizona State Tax Commission v. Garrett Corp., 79 Ariz. 389, 291 P.2d 208 (1955). It would obviously be specious reasoning to say that a seller in "absorbing" the tax fails to make his price cover the amount of the tax. In either event, it is ultimately passed on to the purchaser.

or for the use of the United States or any department, establishment, or agency of the United States; * * *."

This definition does not include Indian reservations. An Indian reservation is land held by the United States for Indian use, not for use by the United States. See Your Food Stores, Inc. (NSL) v. Village of Espanola, 68 N.M. 327, 361 P.2d 950 (1961). All the Buck Act purports to do is subject to state taxation persons previously not taxed because the transaction "occurred in whole or in part within a Federal area." [16] The basis for not taxing an Indian trader is not the physical location of the trading post, but the fact that such a trader conducts "commerce with the Indian Tribes" within the language and purpose of the Commerce Clause. If the legislation regulating Indian traders was based upon the power of Congress to control entry and operations on the area where the trading post is located, then perhaps the Buck Act might be construed to give congressional consent to state taxation. But state taxation in the instant case conflicts with federal policy based on Commerce Clause regulation, rather than on proprietary or

jurisdictional regulation. See 58 Interior Dept. Decisions 562 (December 24, 1943).

The thesis of the majority opinion, reduced to its simplest elements, is: The Arizona tax in question is imposed on all persons within the territorial boundaries of the state for the privilege of engaging in the business of selling at retail. The state has imposed the tax on the seller, and it is not concerned with his manner of sale or choice of buyers. He is not required to collect the tax from the buyer. He may do so by collecting it in addition to the specified selling price, or he may "absorb" it in the price to the purchaser.[17] The state has no interest in the source which the seller uses in remitting the tax, although it is calculated on the selling price. Therefore if the seller chooses to sell to Indians on a reservation, this neither relates to the imposition of the tax on the trader, nor does it interfere with or violate any federal constitutional or statutory provision.

Since the trader in this case is a business corporation, not a charitable or philanthropic organization, it would be unrealistic to suppose that the trader would abandon the general business practice of passing a

16. See, e. g. Bowers v. Oklahoma Tax Commission, 51 F.Supp. 652 (D.C.Okla. 1943) (contractors on Fort Sill Military Reservation); Hill v. Joseph, 205 Misc. 441, 129 N.Y.S.2d 348 (1954) (concessionaires on Bedloe's Island); Kiker v. City of Philadelphia, 346 Pa. 624, 31 A. 2d 289 cert. denied 320 U.S. 741, 64 S.Ct. 41, 88 L.Ed. 439 (1943) (employees of

League Island Navy Yard); Howard v. Commissioners of Sinking Fund, 344 U. S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953) (employees of naval ordinance plant); City of Springfield v. Kenney, 104 N.E.2d 65 (Ohio App.1951) (residents of federal housing project).

17. Arizona State Tax Commission v. Garrett Corp., supra.

**130**

tax on to the consumers in some form. The factor which the majority opinion overlooks or ignores is that in doing so, the trader must adjust his selling prices. In turn, this adjustment of selling prices becomes a factor *created by state fiat* which the Commissioner of Indian Affairs and the trader must take into consideration in determining the prices at which a trader must sell merchandise to reservation Indians. This applies to traders already licensed by the Commissioner, as well as to those making application for the privilege in the future.

The majority maintains this situation does not create an interference with the regulation of commerce with the Indian tribes. I maintain that it does.