**196 P.2d 456**

**HARRISON et al. v. LAVEEN.**

**No. 5065.**

Supreme Court of Arizona.

July 15, 1948.

Richard F. Harless and Lemuel P. Mathews, both of Phoenix, and Ben B. Mathews, of La Mesa, Cal., for appellants.

Francis J. Donofrio, County Atty., Warren L. McCarthy, Deputy County Atty., both of Phoenix, for appellee.

T. Vincent Quinn, Asst. Atty. Gen., Frank E. Flynn, U. S. Atty. for Dist. of Arizona, and Charles B. McAlister, Asst. U. S. Atty. for Dist. of Arizona, both of Phoenix, James E. Curry and Frances Lopinsky, both of Washington, D. C., and Charles MacPhee Wright, of Tuscon (Felix S. Cohen, of Washington, D. C., of counsel), amici curiae.

UDALL, Justice.

The right of American Indians to vote in Arizona elections for state and federal officers has after two decades again arisen, like Banquo's ghost, to challenge us.

Frank Harrison and Harry Austin, members of the Mohave-Apache Indian Tribe, residing on the Fort McDowell Indian Reservation, which lies wholly within the Scottsdale precinct of Maricopa County, Arizona, sought to register preparatory to exercising their claimed right of franchise. When Roger G. Laveen, county recorder of said county, refused to permit them to do so, the Indians as plaintiffs brought this action in the superior court of Maricopa county seeking a writ of mandamus compelling the recorder to register them. The complaint alleged in detail that plaintiffs possessed all the qualifications for suffrage as set forth in the constitution and laws of the state of Arizona, and asserted that if they were denied the right to register and vote they would be deprived of the franchises, immunities, rights, and privileges of citizens which are guaranteed to them under the constitution and laws of both the United States and the State of Arizona.

The defendant recorder moved to dismiss the complaint for the reason that it failed to state a claim upon which relief could be granted under the authority of the decision of this court in the case of Porter v. Hall, 1928, 34 Ariz. 308, 271 P. 411, 412. This motion was granted and subsequently judgment was entered for the defendant as the plaintiffs elected to stand upon their complaint. An appeal was taken and the matter is now before us for review. Helpful briefs have been filed in behalf of the United States of America, the National Congress of American Indians, and the American Civil Liberties Union, who, by permission, appear as amicus curiae.

We shall refer to the parties as they were designated in the lower court, the Indians as plaintiffs and the recorder as defendant.

The allegations of the complaint in the instant case vary somewhat from the agreed statement of facts upon which the Porter case was tried, e. g., it is alleged that plaintiff Harrison was inducted into the military service in World War II and thereafter received an honorable discharge. Furthermore, in paragraph V appears this allegation: "That the plaintiffs and each of them own property, some of which is located at various times outside the boundaries of the said Fort McDowell Indian Reservation in the State of Arizona. That the plaintiffs and each of them assessed for taxes by and pay taxes to the State of Arizona. That the plaintiffs and each of them are subject to the civil and criminal laws of the State of Arizona and of the United States of America, and are permitted to leave said Fort McDowell Indian Reservation at any time that either or both of said plaintiffs so desire."

However, it is our view that neither the payment of taxes nor the rendering of military service by plaintiff is in any way determinative of his right to vote for the reason that the law (our constitution and statutes) does not prescribe such as necessary qualifications of an elector. But basically the same question is presented here as was presented in the Porter case, and that is, are plaintiffs persons "under guardianship" within the meaning of section 2, article 7, of the Arizona Constitution and section 55-201, A.C.A.1939, which denies the franchise to persons who are convicted felons or are "under guardianship, non compos mentis, or insane". If this primary question be answered in the affirmative, as it was in the Porter case, then we must determine whether such denial of the franchise to plaintiffs violates the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

The opinion in the last-mentioned case laid at rest the contention there made that members of Indian tribes residing on Indian reservations were not "residents of the state of Arizona", as it was held that Indian reservations in Arizona are within political and governmental boundaries of the state, and limitations on state's jurisdiction in Enabling Act apply only to Indian lands considered as property, but do not withdraw territorial area from sovereignty of state and control of its laws.

While the county attorney of Maricopa county, as counsel for defendant, does not expressly invoke the doctrine of stare decisis, he does earnestly urge that the majority opinion in the Porter case is sound and should be adhered to. His argument follows closely the reasoning adopted by the distinguished author of the majority opinion, and we submit that no better case can be made for those subscribing to the view that tribal Indians are not legally entitled to vote in Arizona than was made by Justice Lockwood. We have, however, no hesitancy in re-examining and reconsidering the correctness of the legal principles involved because the civil liberties of our oldest and largest minority group (11.5% of State's population) of whom 24,317 are over twenty-one years of age (1940 U. S. census) are involved, and it has ever been one of the great responsibilities of supreme courts to protect the civil rights of the American people, of whatever race or nationality, against encroachment.

The recent "Report Of The President's Committee On Civil Rights," U. S. Government Printing Office, Washington, 1947, brands the decision in the Porter case as being discriminatory and recommends that suffrage be granted by the states of Arizona and New Mexico to their Indian citizens. Ibid., page 161. We quote from that report: "In past years, American Indians have also been denied the right to vote and other political rights in a number of states. Most of these restrictions have been abandoned, but in two states, New Mexico and Arizona, Indians continue to

be disfranchised. The constitution of New Mexico withholds suffrage from Indians not taxed. In Arizona the state constitution has been interpreted to deny the vote to Indians as being persons under guardianship. Protest against these legal bans on Indian suffrage in the Southwest have gained force with the return of Indian veterans to those states." Ibid., p. 40.

In a democracy suffrage is the most basic civil right, since its exercise is the chief means whereby other rights may be safeguarded. To deny the right to vote, where one is legally entitled to do so, is to do violence to the principles of freedom and equality.

It would be idle to contend that tribal Indians do not still occupy a peculiar and unique relationship to the federal government. They are, except for a few civilized tribes, still regarded and treated by the United States as requiring special consideration and protection. For nearly a century they were treated as separate "nations" and the legal rights of the members were fixed by treaty. Many of these treaties are still in force and of recognized validity. However, Congress stopped making such treaties in the year 1871, but since then more than four thousand distinct statutory enactments have been passed by the Congress comprising what is commonly referred to as "Indian Law". Many of the Federal enactments arise from the express grant to Congress found in article 1, section 8, cl. 3 of the Constitution of the United States; "to regulate Commerce * * * with the Indian Tribes;". Generally speaking tribal Indians are not subject to State law. The exemption is particularly true in the fields of criminal law and taxation.

In passing it might not be amiss, to make this observation on the taxation situation as applied to Indians in Arizona. Under section 20 of the Enabling Act, and article 20(5), constitution of Arizona (the latter being an ordinance irrevocable without the consent of the United States and the people of Arizona) it was solemnly agreed: "* * * and no taxes shall be imposed by this state on any lands or other property within an Indian reservation owned or held by any Indian; but nothing herein shall preclude the state from taxing as other lands and other property are taxed, any lands and other property outside of an Indian reservation owned or held by any Indian, save and except such lands as have been granted or acquired as aforesaid, or as may be granted or confirmed to any Indian or Indians under any act of congress."

The Ninth Circuit Court of Appeals in the case of United States v. Porter, 22 F. 2d 365, has upheld the right of the state of Arizona to tax tribal Indians for property owned by them which is located off the reservation, but the state's right to tax their property on the reservation has, for the present, been expressly prohibited by the above quoted ordinance. Nor is the

state's sales tax now being collected from Indians for purchases made by them on the reservation.

The Congress on June 2, 1924, 43 Stat. 253, declared all Indians to be citizens of the United States, 8 U.S.C.A. § 3, and then, just prior to World War II, on October 14, 1940, enacted the "Nationality Act of 1940", U.S.C.A., Title 8, section 601, so as to clear up any doubt created by the language of the Act of 1924 as to the status of Indians born after the effective date of the prior Act.

Tribal Indians were held to be subject to the Selective Training and Service Act of 1940, U.S.C.A. Title 50, Appendix, § 301 et seq., in the case of Totus v. United States, D.C., 39 F.Supp. 7, and we know that from our own State thousands of these native Americans served in the armed forces with pride and distinction, e. g., Ira Hamilton Hayes, a Pima Indian, participated in the epochal raising of the stars and stripes on Mt. Surabachi on Iwo Jima.

However, it should be noted that the Federal courts have held that the congressional power over Indians is not diminished by the grant of citizenship. United States v. Waller, 243 U.S. 452, 459, 37 S.Ct. 430, 61 L.Ed. 843. See also 19 Cal.Law Review 513. Avowedly the government's policy aims at the full integration of Indians into the political, social, and economic culture of the nation, and during the twenty years that have elapsed since the decision in the Porter case some significant changes have taken place in the legal position of the Indian which have a bearing upon the applicability of that decision to contemporary conditions.

Many years ago in the field of domestic relations the legislature of Arizona in order to encourage the Indians to marry by authority of license issued by the state, empowered Indian superintendents to issue licenses and solemnize the rites of matrimony. Section 63-106, A.C.A. 1939. The law has recently been amended which prohibited the intermarriage of Caucasians and Indians. Section 63-107, A.C.A. 1939, amended 1942, 1st S.S. ch. 12. And this court will take judicial notice of the fact that the superior courts of the state are frequently granting divorces to members of Indian tribes. A goodly number of estates of Indians are also being probated in these courts.

At the request of the Secretary of the Interior, Dr. Lewis Meriam of the Brookings Institute submitted a critical report (1928) entitled "The problem of Indian Administration" which resulted in legislation and administrative reforms tending to see that Indians enjoyed more nearly the rights and privileges enjoyed by their white neighbors. See the monumental work by Felix S. Cohen, entitled "Handbook of Federal Indian Law", pages 83-87, for detailed list of such congressional enactments and changes in administrative regulations. However, progress along these lines has

been slow, particularly in Arizona where approximately one-sixth (54,278 U. S. Census 1940) of all Indians in the United States reside. With some of our more illiterate and backward tribes, such as the neglected Navajos, the government it would seem, has moved at a snail's pace largely by reason of its failure to discharge its solemn treaty obligation of June 1, 1868, 15 U.S. Stat. 667, of providing adequate educational facilities.

■■ Probably the most searching appraisal and analysis of the two opinions (majority and minority) rendered in the Porter case, as well as the whole general problem of the right of Indians to vote, is the scholarly article entitled "The legal status of Indian suffrage in the United States" written in the year 1930 by Dr. N. D. Houghton, then and now, professor of political science at the University of Arizona, which appears in volume 19 of the California Law Review, page 507 et seq. The learned doctor clearly points out the greatest weakness in the prevailing opinion, that is, that the court largely based its decision upon the question of whether it was sound public policy to permit Indians to vote rather than adhering, as Chief Justice Ross maintained it should, to applying the disqualifying provisions of the law as written, we quote: "The majority of the court, and the dissenting Chief Justice, as well, were strongly affected by the legitimate question as to whether it would be good public policy to permit large numbers of tribal Indians living on reservations in the state, and entirely immune from the laws and governmental authority of the state, so long as they remain on the reservations, to participate in the formulation of state governmental policy and the election of state and local officials. The Chief Justice, however, considered the proper function of the court to be that of applying the law as it stands, leaving to the political departments of the government the duty of changing the law, or making new law, when that may be necessary in order to declare and maintain sound public policy. He pointed out that it might be possible that tribal Indians on reservations ought not, as a matter of public policy, to be allowed to vote, but he expressed the opinion that further legal or constitutional action was necessary in Arizona in order legally to disqualify them." 19 Cal.Law Review 518.

Our view coincides with the late Chief Justice Ross that the matter of determining what is "good public policy" is for the executive and legislative departments and that the courts must base their decisions on the law as it appears in the constitution and statutes. We concede that very persuasive arguments may be advanced upon both sides of the "public policy" question, but we refuse to be drawn into the controversy as to the wisdom of granting suffrage to the Indians, our sole concern being whether the constitution, fairly interpreted, denies them the franchise.

Justice Lockwood in the Porter case in reaching the conclusion that reservation Indians were "persons under guardianship" as that term is used in article 7, section 2 of the Arizona Constitution, assigned great weight to the numerous decisions of the United States Supreme Court designating Indians as "wards" of the government. This terminology was first used by Chief Justice Marshall by way of analogy. He described Indian tribes as having a relationship to the United States which "resembles that of a ward to his guardian" Cherokee Nation v. Georgia, 5 Pet. 1, 8 L.Ed. 25, (Incidentally the right of suffrage was not there involved.) Later judges began using this characterization literally without regard to the figurative sense in which it was first employed. Admittedly there are important similarities and suggestive parallels between the two relationships. In the "Handbook of Federal Indian Law" p. 169 et seq. the author points out some ten distinct connotations of the term "wardship" as applied to Indians. Primarily in its original and most precise signification the term "ward" in the federal decisions and statutes has been applied (a) to tribes rather than to individuals, (b) as a suggestive analogy rather than as an exact description, (c) to distinguish an Indian tribe from a foreign state, and (d) as a synonym for "beneficiary of a trust" or "cestui que trust". The failure to distinguish among these different senses in which the term "ward" has been so loosely used is responsible for a considerable amount of the existing confusion.

We have made an extensive search of the proceedings of the Arizona Constitutional Convention and are unable to find the slightest evidence to indicate that the framers of our constitution, in specifying that "persons under guardianship" (section 2, article 7) should be denied the right of franchise, thereby intended that this phrase be applied to Indians as such. The same thing may be said as to the legislative implementing enactment contained in section 55-201, supra. In other words, the legislative department of government has not set up this barrier; rather we feel, it is a tortious construction by the judicial branch of the simple phrase "under guardianship", accomplishing a purpose that was never designed by its framers.

It is highly significant that the constitutions of many of the states of the union have similar provisions disfranchising "persons under guardianship", yet with a widely scattered Indian population of 333,969 Indians (1940 census) in the United States, not an appellate court, except Arizona, has held that Indians because of their peculiar and unique relationship to the Federal government are thereby prohibited from voting. In the only reported case, in so far as we have been able to find, where such a contention was squarely presented it was rejected as being unsound. Swift v. Leach, 45 N.D. 437, 178 N.W. 437. The prevailing opinion in the Porter case declined to agree

with such a conclusion. Chief Justice Ross, in his forceful and well reasoned dissent said it was good law.

In the Porter case the majority opinion emphasized that "under the maxim 'noscitur a sociis'" (it is known from its associates) that the three separate classes of persons disqualified to vote, i. e. persons under guardianship, non compos mentis and insane "must be considered to have some common quality or relationship". The court then concluded that it was the purpose of the constitution (section 2, article 7) by these three phrases to disfranchise all persons not sui juris. We have no quarrel with this conclusion but deem it non-sequitur to hold that reservation Indians, as a class, can be properly so characterized.

Black's Law Dictionary, Third Edition, p. 1676, defines the term, sui juris, as: "Lat. Of his own right; possessing full social and civil rights; not under any legal disability, or the power of another, or guardianship. Having capacity to manage one's own affairs; not under legal disability to act for one's self."

It seems to us that this court, by the decisions hereinafter mentioned, has definitely disproved its premise in the Porter case, that Indians are not sui juris as above defined. The term "non sui juris" according to its generally accepted meaning, is a condition which, among other things, prevents a person from maintaining an action at law in his own name. Yet, Peter H. Porter, the plaintiff in the Porter case, sued, as the plaintiffs here have done, in his own name. If he was non sui juris the court could have speedily disposed of the case by determining that the action had not been brought by the real party in interest, namely Porter's guardian, section 21-501, A.C.A. 1939, whoever that might be.

In the case of Denison v. State, 34 Ariz. 144, 268 P. 617, it was held that a full blooded Indian who had lived on a reservation all of his life was qualified to serve as a juror in the trial of a criminal case. While it is true that the legislature, in prescribing the qualifications of a juror did not use the term "under guardianship" the statute does provide that a juror must be "intelligent" and of "sound mind".

The statutes of Arizona prescribe only two reasons for the appointment of a guardian-general, special or ad litem—and they are that the ward (a) is not of age, section 42-101 to 42-134, A.C.A. 1939, (b) is not capable of taking care of himself or managing his property. Section 42-135 to 42-143, A.C.A. 1939. Yet neither of these grounds were urged, as to the individual plaintiffs, in either the Porter case or in the instant case.

In the case of Begay v. Sawtelle, 53 Ariz. 304, 88 P.2d 999, 1001, again a tribal Indian was permitted to sue in his own right, and this court determined that he was entitled to a writ of mandamus against the State Game Warden requiring such warden to issue him a hunting and fishing license. A legislative act, section 2, chapter

44, Session Laws of Arizona 1935 declared it unlawful for any Indian, a ward of the federal government, to take game or fish off the reservation to which he belongs. Denying plaintiff a license was declared by this court violative of the fourteenth amendment to the Constitution of the United States: Here Justice Lockwood referred to this elusive form of guardianship as a "special kind of guardianship", which, we submit, is a designation unknown to our jurisprudence.

In the case of Fernandez v. State, 16 Ariz. 269, 144 P. 640, this court held that an Indian living on a reservation was a competent witness in judicial proceedings. Finally in the year 1943 in the case of Bradley v. Arizona Corporation Commission, 60 Ariz. 508, 141 P.2d 524, we upheld the constitutional right of another tribal Indian to sue and to obtain a certificate of convenience and necessity for the operation of a motor vehicle as a contract motor carrier.

It will thus be seen that this court has liberally construed state laws (except insofar as granting the elective franchise is concerned) favorable to the civil rights of Indians along with all other citizens of the United States.

The rulings of this court, in so far as the Indians' right to sue and be sued is concerned would seem to bear out the pronouncements contained in the "Handbook of Federal Indian Law" to the effect:

"(5) Individual Indian as party litigant.—As a general rule, an Indian irrespective of his citizenship or tribal relations, may sue in any state court of competent jurisdiction to redress any wrong committed against his person or property outside the limits of the reservation. But the mere fact that the plaintiff is an Indian does not vest jurisdiction in the federal courts." Ibid. 372.

"Section 5 State Courts.

"In matters not affecting either the Federal Government or the tribal relations, an Indian has the same status to sue and be sued in state courts as any other citizen. It may be stated, however, as a general proposition, that the state courts have no jurisdiction in civil matters affecting the restricted property or tribal relations of the Indians, unless otherwise provided by Congress, so long at least as the United States retains governmental control over them." Ibid. 379.

The term "guardianship" has a very definite meaning, both at common law and under the Arizona statutes. Some of the essential features of "guardianship" are: (1) that the guardian has custody of the person of the ward; (2) that the ward is under duty to live where the guardian tells him to live; (3) that the legal title to the property of a ward is in the ward, rather than in the guardian, but that the ward may not make contracts respecting his property; (4) that the guardian may also

decide what company the ward may keep. None of the foregoing characteristics apply to the plaintiffs or to other Indian citizens similarly situated. No superintendent or other official or employee of the United States has custody of the person of the plaintiffs. They are not confined to the reservation and may leave it at any time they so desire. The plaintiffs are under no duty to follow the advice or instructions of any Federal officials in selecting a place to live. The power of the commissioner of Indian Affairs, or of the local superintendent, to decide what people might visit an Indian reservation and meet with the Indians thereon was abolished in 1934, Act May 21, 48 Stat. 787. The plaintiffs have full and untrammeled right to utilize their own property (except their interest in land or other property to which the Federal government has a trustee's title) as they see fit and to receive and expend the income therefrom without Federal interference. A cestui que trust or beneficiary of a trust estate who is a white person does not thereby become a person "under guardianship".

 It is axiomatic that if a person is under guardianship he must have a guardian. If an Indian, living on a reservation, is under guardianship the United States presumably must be his guardian. Yet in the instant case the United States is appearing specially in this litigation as amicus curiae to disclaim any intention to treat the plaintiffs as "persons under guardianship".

Certainly the state courts cannot make the United States a guardian against its will. Nor do we believe that the "guardianship" referred to in the Arizona constitution, section 2, article 7, was of the type that could be dissolved by merely stepping across an imaginary line—the boundary of an Indian reservation. Furthermore, to ascribe to all Indians residing on reservations the quality of being "incapable of handling their own affairs in an ordinary manner" would be a grave injustice. for amongst them are educated persons as fully capable of handling their affairs as their white neighbors. This leads us to the conclusion that the framers of the constitution had in mind situations where disabilities are established on an individual rather than a tribal basis.

 Judicial references to seamen as "wards of the government" are even more common than the references to Indians as "wards of the government". Yet Arizona has never denied white or black seamen the right to vote as being "persons under guardianship". Similarly it may be noted that members of the armed services, federal employees, veterans, and even beneficiaries or recipients of social security payments or other Federal payments have all been referred to loosely, from time to time, as "wards of the government", yet no one has had the temerity to suggest that such persons, when otherwise qualified, were ineligible to vote. It might be well to mention here that only those persons, Indians or

those of any other race, who are able to meet the literacy test prescribed by section 55-201, A.C.A. 1939, " * * * and who, not being prevented by physical disability from so doing, is able to read the constitution of the United States in the English language in such a manner as to show that he is neither prompted nor reciting from memory, and to write his name, shall be deemed to be an elector of the state * * * " are entitled to register and vote.

For the reasons heretofore stated we are of the opinion that the term "person under guardianship" as used in section 2, article 7 of the Constitution of Arizona was intended to mean a judicially established guardianship, for as stated by the late Chief Justice Ross in the Porter case "it is not a status that 'resembles' guardianship, but legal guardianship, authorized by law" that disqualifies one from voting. We hold that the term "persons under guardianship" has no application to the plaintiffs or to the Federal status of Indians in Arizona as a class. This conclusion makes it unnecessary to consider the Federal constitutional question heretofore stated. The majority opinion in the case of Porter v. Hall, supra, is expressly overruled in so far as it conflicts with our present holding.

The trial court erred (though understandably so) in granting defendant's motion to dismiss the plaintiffs' complaint and in entering judgment for defendant. The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

STANFORD, C. J., and LaPRADE, J., concur.