THOMAS, Chief Judge,
dissenting:
Voting should be easy in America. In Arizona, it is not, and the burden falls heaviest on minority voters. At issue in this appeal is Arizona’s refusal to count ballots cast out-of-precinct, even for races in which the citizen is entitled, qualified, and eligible to vote. Statistically significant evidence shows that this practice disproportionately and adversely impacts minority voters. Because the district court erred in denying the motion for a preliminary injunction directing that these legitimate votes be counted, I respectfully dissent.
I
Under federal and state law, a voter who appears to vote at the wrong precinct is entitled to cast a provisional ballot. 52 U.S.C. § 21082; A.R.S. § 16-584. In Arizona, these provisional ballots are placed in a tub and taken to a voting center. There, the voters’ addresses are compared with precinct geography. If a ballot was cast by a person who lives in the precinct where he or she voted, then it is counted. If the voter’s address was outside the precinct, the ballot is rejected in its entirety, even as to races and ballot measures for which the voter was entitled to cast a ballot. These races include Presidential, Senatorial, and statewide elections, and Congressional elections if the voter lives in the Congressional district.
*629 Arizona is among the nation’s leaders in the number of ballots deemed provisional. It leads the nation, by a wide margin, in the number of provisional ballots rejected, and therefore not counted. The primary reason for rejecting provisional ballots in Arizona is that they were cast out-of-precinct. The following graph illustrates Arizona’s experience in comparison with that of other states:
[[Image here]]
Since 2006, Arizona has rejected over 121,000 provisional ballots cast out-of-precinct. Of the voters visiting a polling place in Arizona in the 2012 general election, 22% were asked to cast a provisional ballot, and over 33,000 of these—more than 5% percent of all in-person ballots cast— were rejected. The provisional voting rate was 18% in 2014. No other state rejects a larger share of its in-person ballots.
Rejected out-of-precinct provisional ballots are most prevalent in the relatively urban counties, especially Maricopa and Pima. The vast majority of Arizonans live in Maricopa and Pima Counties. Indeed, Maricopa County accounts for 61% of Arizona’s population and almost 70% of all out-of-precinct ballots cast.
Why is there such a high rate of out-of-precinct voting in Phoenix and Tucson? The answer largely is that are relatively few polling places in those cities, and polling sites change with great frequency. As the plaintiffs’ expert put it: “Voters must invest- significant effort in order to negotiate a dizzying array of precinct and polling place schemes that change from one month to the next.” As one State Senator observed, it is not uncommon for a voter’s assigned polling location to change nearly every election. And, significantly for our consideration, changes in polling place locations are statistically associated with higher rates of out-of-precinct voting.
The 2012 election cycle in Maricopa County provides an example. In the general mid-term election in November 2010, ■there were 1,143 polling places. For the Presidential Preference Primary in February 2012, there were 211. For the general *630 2012 election, there were 724. In 2008, 2012, and 2016, Maricopa County used a completely different precinct ■ system for the. Presidential Preference Primary than for the general election. In returning to' a precinct model, the County places one polling place in each precinct. However, the number of registered voters varies widely from precinct to precinct. For example, one precinct had approximately 100 registered voters; another in the same geographic area had 9,000.
For the Presidential Preference Primary in 2016, Maricopa County used a “vote center model,” in which voters can vote in any polling place in the county, with the appropriate precinct ballot being generated for each voter at the vote center. However, for the 2016 general election, Marico-pa County switched back to the precinct-model system, assigning voters back to hundreds of precincts.
Geography also plays a role. Many polling places are located directly on precinct boundaries. Multiple polling places are often clustered together, sometimes even in the same building. Some of these voting places are outside the boundaries of the voter’s actual precinct. Many voters cast their ballots in incorrect precincts simply because they stood in the wrong line at a multi-precinct location.
An assigned polling place is not necessarily the poll closest to the voter’s residence. In fact, in Maricopa County, one quarter of out-of-precinct voters cast ballots in an incorrect polling place that was actually closer to their' home than their assigned polling place. Indeed, most out-of-precinct votes in Maricopa County are cast very close to the assigned polling place.
Causing additional confusion is the fact that the City of Phoenix conducts elections at the same time at completely different polling places. Thus, a citizen who wished to vote in person in both city and state elections would have to travel to two entirely different voting places on election day.
The reduction of the number of polling places in Phoenix has also had an impact on voting. During the last Presidential election, voters in some precincts waited four to six hours to cast their ballots. One Congressman testified that voters did not complete voting in his district until well after midnight. A State Senator testified that there was only one polling place in his district of 70,000 people. In that district, it would take a voter using public transportation 50 minutes to get to the voting booth. He testified that in West Phoenix, an area consisting of over 200,000 people in predominantly Hispanic neighborhoods, there were only two voting centers. In his district, voters waited up to 5 hours to vote.
In addition, there were voters who were not told where their correct precinct was located when their ballots were categorized as provisional, thereby preventing them from voting at the correct precinct. One voter left the hospital to vote after undergoing heart by-pass surgery. Two polling places where he had voted previously were closed. He.found a pamphlet sent to him by the county listing his polling place, went to the place indicated, and voted a provisional ballot. The election workers did not tell him that his vote would not be counted, nor did they identify his correct voting place.' He returned to the hospital after voting. His vote was rejected in a race that ended up being decided by a handful of votes.
How does this complicated, kaleidoscopic method of designating polling places affect minority voting? The record is undisputed: it has a statistically significant adverse affect on minority voters.
*631 The numbers are startling. The rate at which in-person ballots were rejected and not counted because the votes were cast out-of-precinct was 131% higher for Hispanics, 74% higher for African Americans, and 39% higher for Native Americans than for white voters.
According to, the data collected by Mari-copa County, many voters whose ballots were classified as having been cast in the wrong precinct did not make a mistake at all. Their ballots were marked as “out-of-precinct”, and discarded even though their registration precinct matched residency records for the precinct. In other words, the citizen voted in the right place, but the voters properly cast ballot was improperly rejected as being cast out-of-precinct.
The rate at which these ballots were rejected along ethnic and racial lines was also significant: 80% higher for Hispanics, 34% higher for African Americans, and 26% higher for Native Americans in comparison with white voters. This problem is not trivial: fully 35% of the ballots rejected as being out-of-precinct were discarded in error. And the disparity between white and nonwhite voters has proven consistent over time.[1]
The following graph illustrates the ethnic and racial disparity of out-of-precinct ballots cast in Maricopa County from 2010-2014:
[[Image here]]
Overall, as the district court noted, white voters accounted for 56% of the out-of-precinct ballots, despite casting 70% of all in-person votes. In contrast, Hispanic *632 voters made up 15% of in-person voters, but accounted for 26% of out-of-precinct votes. African Americans accounted for 10% of in-person voters, but 13% of out-of-precinct votes.
Similar results occurred in Pima County for the general elections of 2010 and 2012. The rates at which African Americans and Hispanics cast out-of-precinct ballots in Pima County were significantly higher than the rate for whites in both years. In 2012, the rate at which African American voters cast out-of-precinct ballots was 37% higher than for white voters. For Hispanics, the rate was 123% higher than for white voters. The rate was also higher in 2012 for Native American voters by 47% in comparison to white voters. Each of these differences is statistically significant. These racial and ethnic differences were also statistically significant in the 2010 mid-term general election.
This disparity also exists in rural areas. In non-metropolitan counties, out-of-precinct voting is negligible in majority-white precincts, but increases dramatically in precincts where Hispanics and Native Americans make up majorities.
Based on these facts, the plaintiffs filed suit under § 2 of the Voting Rights Act and the First and Fourteenth Amendments, alleging that Arizona’s practice of discarding out-of-precinct ballots disparately burdens minorities and leaves them with less opportunity than other members of the electorate to participate in the political process. The district court denied their motion for a preliminary injunction, which brings us to the instant appeal.
II
The district court erred in denying the motion for a preliminary injunction founded on Voting Rights Act violations. As I noted in the companion appeal, the Voting Rights Act of 1965 “was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century.” State of S.C. v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) abrogated by Shelby Cty., Ala. v. Holder, —■ U.S.-, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013). The Act “implemented Congress’ firm intention to rid the country of racial discrimination in voting. It provided stringent new remedies against those practices which have most frequently denied citizens the right to vote on the basis of their race.” Allen v. State Bd. of Elections, 393 U.S. 544, 548, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).
The central purpose of the Act was “[t]o enforce the fifteenth amendment to the Constitution of the United States.” Chisom v. Roemer, 501 U.S. 380, 383, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (quoting Pub.L. 89-110, 79 Stat. 437, 42 U.S.C. § 1973 et seq.). The Fifteenth Amendment provides that “[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.” U.S. Const, amend. XV, § 1.
At issue in this preliminary injunction appeal, as well as in the companion appeal, is § 2 of the Act, which is “a restatement of the Fifteenth Amendment.” Chisom, 501 U.S. at 392, 111 S.Ct. 2354. Section 2 provides, without limitation, that any voting qualification that denies citizens the right to vote in a discriminatory manner violates the Voting Rights Act. 52 U.S.C. § 10301; see also Allen, 393 U.S. at 566-67, 89 S.Ct. 817 (noting that Congress intentionally chose the expansive language “voting qualifications or prerequisite to voting, or standard, practice, or procedure” for § 2 so as to be “all-inclusive of any kind of practice” that might be used by states to deny citi *633 zens the right to vote (internal quotation marks omitted)). As amended in 1982, § 2 makes “clear that certain practices and procedures that result in the denial or abridgment of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge.” Chisom, 501 U.S. at 383-84, 111 S.Ct. 2354.
. To succeed on a § 2 claim, &• plaintiff must show (1) that “the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice” and (2) “that burden must in part be caused by or linked to social and historical conditions that have or currently produce discrimination against members of the, protected class.” League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 240 (4th Cir. 2014) (internal quotations omitted); see also Veasey v. Abbott, 830 F.3d 216, 244 (5th Cir. 2016).
A
The record, of this- case demonstrates that the challenged practice of refusing to count votes cast out-of-precinct for races in which the voters were eligible to participate caused minority voters “less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” League of Women Voters, 769 F.3d at 240.[2] Unlike the companion appeal, which involved a situation in which statistical evidence was not possible to obtain, this case involves hard, statistically significant proof of discriminatory effect.
The district court acknowledged this proof, and credited it for the purposes of its analysis. However, it deemed the evidence insufficient at stage one of the Voting Rights Act analysis because, in the district court’s view, the rejected out-of-precinct votes did not constitute a significant portion of the total votes cast. In the district court’s view, the plaintiffs were required to prove that the rejection of out-of-precinct ballots cast by minorities “meaningfully reduces the likelihood that minority as compared to white voters will cast ballots that are ultimately counted.”
No other court in the nation has imposed such a requirement. There is no support for the district’s court new requirement either in the text of the Voting Rights Act or in any case construing it. The standard at stage one is simply that the “the challenged standard, practice, or procedure must impose a discriminatory burden on members of a protected class, meaning that members of the protected class have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” League of Women Voters, 769 F.3d at 240. The key phrases here are “burden” and “less opportunity.” The standard does not include “meaningful” or significant overall electoral impact.
A Voting Rights Act plaintiff need not show that the challenged.voting practice caused a disparate impact by itself. Farrakhan v. Washington, 338 F.3d 1009, *634 1018-19 (9th Cir. 2003). Nor must the challenged practice make voting impossible or cause significant electoral impact. It suffices for a violation of the Voting Rights Act that the practice simply makes voting more burdensome. Thornburg v. Gingles, 478 U.S. 30, 35-36, 44, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). And, as the Fourth Circuit succinctly put it, “what matters for purposes of Section 2 is not how many minority voters are being denied equal electoral opportunities, but simply that ‘an/ minority is being denied equal electoral opportunities.” League of Women Voters, 769 F.3d at 244. As Justice Scalia put it:
If, for example, a county permitted voter registration for only three hours one day a week, and that made it more difficult for blacks to register than whites, blacks would have less opportunity “to participate in the political process” than whites, and § 2 would therefore be violated—even if the number of potential black voters was so small that they would on no hypothesis be able to elect their own candidate,
Chisom, 501 U.S. at 408, 111 S.Ct. 2354 (Scalia, J., dissenting) (emphasis in original); see also id. at 397, 111 S.Ct. 2354 (Maj; Op.).
Put another way, the district court and the State are arguing that the minority voters’ claims must fail because their votes really didn’t matter to the electoral outcome. That proposition is contrary to the entire theory of the Voting Rights Act. As the Supreme Court has observed: “No right is njore precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.” Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).
Black votes matter. Hispanic votes matter. Native American votes matter. White votes matter. All votes matter.
And the district court and the State are wrong to assume that, because the improperly rejected votes constituted a relatively small portion of the total votes cast, those votes really didn’t matter. Arizona has had a long history of very close elections. Indeed, earlier this year, in the Fifth Congressional District Republican primary, Andy Briggs defeated Christine Jones by 27 votes. .
And the list' goes ón. In the 2014 Second Congressional District, Martha McSally defeated Ron Barber by 167 votes. The 2012 Democratic primary in the Fourth Congressional' District between Johnnie Robinson and Mikel Weisser was decided by 19 votes. Proposition 112, a 2010 statewide ballot measure seeking to shorten the filing deadline for initiative petitions, lost by 194 votes. The 2002 Arizona Gubernatorial election was decided by slightly over 10,000 votes. In the 1994 Democratic primary for U.S. Senate, then-Congressman Sam Coppersmith edged then-Arizona Secretary of State Dick Mahoney by 59 votes. A 1992 Republican legislative primary election between Richard Kyle and John Gaylord resulted in a tie, with the winner being decided in a hand of poker, which Kyle won by drawing a pair of sevens over Gaylord’s failed heart flush.
Indeed, the very first Arizona gubernatorial election in 1912 was very close, and the second race for Governor in 1916 was decided by 30 votes. In sum, close elections have long been part of the fabric of Arizona politics. So votes, in fact, do matter in Arizona, and disenfranchisement of any segment of voters can have an effect on the outcome of an Arizona election.
The district court’s imposition of a “meaningful electoral effect” requirement constituted legal error. For the reasons I *635 have previously discussed, the total number of votes affected is not the relevant inquiry; the proper test is whether minority votes are burdened. If the right to vote in-person by minority voters is burdened, it is not relevant that minorities may vote by absentee ballot. In addition, it is, to say the least, ironic that the State and the district court would rely on early absentee voting in this appeal, when in the companion case, both dismissed absentee voting as a mere “convenience” because, in their view, in-person voting was the intended primary means for voters to cast their ballots.
Here, the plaintiffs established through statistically significant evidence that the practice of not counting out-of-precinct ballots for races in which the voter was qualified to vote afforded minority.voters “less opportunity than other members of the electorate to participate in the political process and to elect representatives' of their choice.” League of Women Voters, 769 F.3d at 240, Plaintiffs more than satisfied their burden as to the first part of their § 2 Voting Rights Act claim.
B
The second part of a § 2 claim requires a plaintiff to show that the burden on voting imposed by the challenged practice is “in part [ ]caused by or linked to social and historical conditions that have or currently produce discrimination against members of the protected class.” League of Women Voters, 769 F.3d at 240; Veasey, 830 F.3d at 244.
As I discussed in my dissent to the companion appeal, the Supreme Court has identified several factors to be taken into consideration, consistent with the legislative history of the Voting Rights Act, namely:
(1)the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;
(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
(6) whether political campaigns have been characterized by overt or subtle racial appeals; and
(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.
Gingles, 478 U.S. at 37, 106 S.Ct. 2752. In addition, the Court added that in some cases, there was probative value in inquiring “whether-there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group” and “whether the policy underlying the state or political subdivision’s use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.” Id. (citing S. Rep., at 28-29, *636 U.S.Code Cong. & Admin. News 1982, pp. 206-207).
Without repeating in detail the evidence tendered by the plaintiffs as to the Gingles factors that I discussed in my prior dissent, Feldman v. Arizona Sec’y of State, 840 F.3d 1057, 1094-98, 2016 WL 6427146, at *29-31 (9th Cir. 2016), it is clear that they satisfied their burden.
As to the first factor, the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process, the plaintiffs produced expert testimony through Dr. David R. Berman of Arizona State University. He detailed Arizona’s long history of imposing burdens on minority voters. In 1912, shortly after gaining statehood, Arizona imposed a literacy test for voting. In Cochise and Pima Counties, the denial of the right to vote meant that nearly half the precincts lacked enough voters to justify holding primary elections in 1912. From 1912 to the early 1960s, election registrars applied the literacy test to reduce the ability of African Americans, Native Americans, and Híspan-les to register to vote. In an action filed against Arizona to enforce the Voting Rights Act, the United States Justice Department estimated that 73,000 people could not vote because of the existence of the literacy test.
The passage of the Voting Rights Act in 1965 caused the suspension of the literacy test in Arizona, but the statute remained in effect until it was repealed in 1972, after Congress banned its use in 1970 through an amendment to the Voting Rights Act. Arizona subsequently unsuccessfully challenged the Congressional ban on literacy tests. Oregon v. Mitchell, 400 U.S. 112, 118, 91 S.Ct 260, 27 L.Ed.2d 272 (1970). In Mitchell, the Court noted that, in Arizona, only two counties out of eight with Hispanic populations in excess of 15% showed voter registration equal to the state-wide average. Id. at 132, 91 S.Ct. 260. In the 1960s, there were a number of initiatives to discourage minority voting in Arizona, such as “Operation Eagle Eye.” Under Operation Eagle Eye, minority voters were challenged at the pools on a variety of pretexts, with the goal of preventing minority voting or slowing down the process to create long lines at the polls and discourage voting.
Native Americans in Arizona especially suffered from voting restrictions. Although Native Americans were U.S. citizens, the Arizona Supreme Court held in 1928 that they could not vote because they were under federal guardianship. Porter v. Hall, 34 Ariz. 308, 271 P. 411, 419 (1928). Even after that ban was overruled in 1948 in Harrison v. Laveen, 67 Ariz. 337, 196 P.2d 456 (1948), Native Americans faced significant obstacles to voting. See generally, Patty Ferguson-Bohnee, The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression, 47 Ariz. St. L.J. 1099, 1112 (2015).
Because of its long history of imposing burdens on minority voting, Arizona became one of nine states subject to the pre-clearance requirements of the Voting Rights Act after it was amended in 1975 to protect language minorities. 40 Fed. Reg. 43746. Under the pre-clearance provision, Arizona was required to obtain the approval of the United States Department of Justice before implementing any law affecting the voting rights and representations of minorities. Since 1982, the Department of Justice has vetoed four statewide redistricting plans proposed by Arizona that appeared to discriminate against minorities. As Dr. Berman testified: “Arizona has a long history of discrimination against Native Americans, Hispanics and African *637 Americans when it comes to their voting rights. This discrimination has been reflected in legislation relating to voter requirements, election law and the manner in which elections have been administered, efforts to intimidate voters, and instances of racial appeals, both subtle and not so subtle during campaigns.” He testified-that “[Ijooking at the history of abuse and neglect, there is no reason to assume that discrimination in regard to voting and election practices is a relic of the past and that the protections provided by preclearance are not needed in Arizona.” .
As to the second factor, the extent to which voting in the elections of the state or political subdivision is racially polarized, Dr. Allan Lichtman of American University provided expert testimony detailing the history of polarized voting in Arizona. Statistical analysis showed the sharp polarization between white and nonwhite voters. Indeed, the data showed that for every election studied, the preferences of white and non-white voters diverged significantly-
For the reasons described in both the discussion of the first Gingles factor and in stage one of the Voting Rights Act analysis, plaintiffs demonstrated a likelihood of success as to Gingles factor three: Arizona has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group.
Because the voting access issues affect the right to vote for a candidate, the fourth factor concerning the candidate slating process is not relevant, and the plaintiffs’ expert conceded that there did not seem to be candidate slating by political parties in recent Arizona history.
The fifth factor, which I shall discuss in more detail later, the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process, falls decisively in favor of the plaintiffs. The plaintiffs’ expert opined that “[tjhe persistent effects of discrimination are substantially demonstrated in the deficient socio-economic position of Hispanic, Native American, and African American people in Arizona.” The plaintiffs tendered significant evidence showing that Arizona minorities suffered in education and employment opportunities, with disparate poverty rates, depressed wages, higher levels of unemployment, lower educational attainment, less access to transportation, residential transiency, and poorer health.
The plaintiffs also provided substantial evidence as to the sixth factor, namely, whether political campaigns have been characterized by overt or subtle racial appeals.
Finally, the plaintiffs provided evidence supporting the seventh Gingles factor, namely, the extent to which members of the minority group have been elected to public office in the jurisdiction. As of January 2016, Hispanics constituted over 30% of the population, but held only 19% of the seats in the Arizona legislature. African-Americans made up 4.7% of the population, but held 1% of the legislative seats. Native Americans fared slightly better, constituting 5.3% of the population and holding 4.4% of the legislative seats.
•In sum, the plaintiffs tendered significant, and mostly uncontradicted evidence, satisfying the Gingles factors at stage two. But, again, the Gingles factors are not the end of the story. We aré obligated to look to the “totality of the circumstances.” 52 U.S.C. § 10301(b). When we do so, we can easily see how the effects of discrimination hinder minority voters’ ability to cast ballots in person. And in assessing the totality *638 of the circumstances, we also must be mindful that the Voting Rights Act does not require proof of intentional discrimination; indeed, Congress specifically amended- § 2 of the Voting Rights Act in 1982 to relieve plaintiffs of the burden of proving discriminatory intent. Chisom, 501 U.S. at 394, 111 S.Ct. 2354; see also Ruiz v. City of Santa Maria, 160 F.3d 543, 557 (9th Cir. 1998) (noting Congress’s statement that the “intent test” was “unnecessarily divisive in that it involved charges of racism on the part of individual officials or entire communities [and] placed an inordinately difficult burden of proof on plaintiffs and [ ] asked the wrong question” (internal alterations and quotation marks omitted)). Rather, courts must consider how the challenged practice “interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives.” Gingles, 478 U.S. at 47, 106 S.Ct. 2752. And proof of-direct causation is not required; it suffices that the challenged practice be “linked” “in part” to social and historic conditions. League of Women Voters, 769 F.3d at 240; Veasey, 830 F.3d at 244.
As to the 'issues raised in this appeal, the fifth Gingles factor is especially relevant, namely “the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.” 478 U.S. at 37, 106 S.Ct. 2752. The district court recognized that the plaintiffs had established this factor, stating that it “did not discount Arizona’s history of racial discrimination or the lingering effects on tbe socio-economic status of minorities.”
The majority seems to require, and the district court implied, that the fifth Gin-gles factor requires proof that intentional discrimination caused minorities adverse socioeconomic effects. However, that is not the proof required. Our Circuit has considered the factor satisfied when there was a history of discrimination and lowered socioeconomic status. See, e.g., United States v. Blaine County Montana, 363 F.3d 897, 914 (9th Cir. 2004) (holding factor satisfied when there was evidence of lowered minority socioeconomic status and historical evidence of discrimination); Old Person v. Cooney, 230 F.3d 1113, 1129 (9th Cir. 2000) (factor satisfied with showing that American Indians have a lower socio-economic status than whites in Montana and that social and economic factors hinder the ability of American Indians in Montana to participate fully in the political process); see also League of Women Voters, 769 F.3d at 235 (employing a similar analysis). Thus, any contrary conclusion is legally erroneous.
The plaintiffs tendered significant evidence showing that Arizona minorities suffered in education and employment opportunities, with disparate poverty rates, depressed wages, higher levels of unemployment, lower educational attainment, less access to transportation, more residential transiency, and poorer health. The district court seemed to doubt that these factors were related to lower out-of-precinct voting by minorities, but the record speaks otherwise. These factors directly contribute to the statistically significant disparity in out-of-precinct.voting by minorities as compared to whites. Indeed, these considerations go to the heart of why Arizona’s refusal to count legitimate out-of-precinct votes most severely affects Arizona’s minority voters.
For instance, minority voters often cannot afford home ownership and they have higher rates of residential mobility than white voters. Because of this, and given *639 the “dizzying array” of changes in polling location, minority voters are more likely to vote in the wrong precinct. Indeed, African American and Hispanic voters are substantially more affected by polling place changes than white voters. In. particular, the impact of precinct consolidation, while statistically significant for all groups, is more than twice as large for Hispanics and African Americans as for non-Hispanic whites.
Data also indicates that significant numbers of Hispanic and African American voters in Phoenix do not have access to an automobile. Reliance -on public transportation disparately burdens minority voters in several ways. Among voters who are transported to the incorrect polling place, minority voters have less opportunity to travel to the correct polling place. Travel distances also vary significantly between white and minority voters. The data shows that minority'voters have to travel much farther than white voters to get to assigned polling places. Hispanics and Native Americans are more likely than whites to live further from their assigned polling places, and Hispanics are more likely to live in proximity to multiple polling places to which they are not assigned. One Congressman serving a district that was 65% Hispanic testified that it took an hour and a half for his constituents to get to the polls via public transportation. And many voting centers are not located near public transportation lines. These are factors considered significant by the- Fourth Circuit, in its consideration of out-of-precinct voting in League of Women Voters, 769 F.3d at 233-34.
In addition, in Maricopa County, there are significantly fewer polling places in Hispanic areas, using population density as a metric, than in predominantly white neighborhoods. Election, day issues in these consolidated polling places, such as long delays in access to voting, disproportionately affect low-income minority voters, who typically have very little flexibility in.their work day, and must vote during a narrow window of time in the morning or evening.. In his study of the 2008 and 2012 elections, Dr. Lichtman concluded that minorities were 61% more likely than whites to experience waiting times of 31 minutes or more. The difference was statistically significant.
Language barriers also pose significant hindrances to minority voters who are not fluent in English. The Plaintiffs tendered evidence that voters in Spanish-speaking areas in Maricopa County received mistranslated or incorrect information from election offices, creating confusion for voters who are not fluent in English. In the 2012 election, Maricopa County sent Spanish-speaking documents with the wrong election date to Hispanic voters. The English version contained the correct information. In a special election this year, over 1.3 million Spanish-speaking households received a ballot with erroneous descriptions of ballot initiatives.
There is an additional consequence of all these hindrances to voting: suppression of voter turnout. The plaintiffs’ expert used the term “calculus of voting,” to describe the overall effect on voter turnout when the barriers to voting exceed the benefits. He noted that “recent research has demonstrated that changes in polling -locations associated with precinct consolidation have a substantial effect on turnout.” Data showed that in Maricopa and Pima Counties, such changes were far more likely to affect minority voters as compared with white voters. Arizona has the second worst turnout of African American voters in the nation. Turnout among African Americans in Arizona’s 2012 Presidential election was 46%; the national average was 66%. The turnout of Hispanic voters in Arizona was *640 39%, compared with a 62% turnout of white voters.
In summary, these historic and socioeconomic Gingles factors are significantly associated with the statistically significant difference in white versus minority out-of-precinct voting. At stage two, the plaintiffs were required only to show that, under the totality of the circumstances, the discriminatory impact of the challenged practice was linked to historic and social factors. They satisfied this burden.
C
Given the plaintiffs’ uncontested proof of the undue burden imposed on out-of-precinct minority voters who were eligible to vote in some races, and the proof of association between this burden and discriminatory historical and socioeconomic factors, the district court erred in denying a preliminary injunction.
The district court also erred in its analysis of the plaintiffs’ Fourteenth Amendment claims. Under Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed,2d 245 (1992) and Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), we must weigh the nature and magnitude of the burden imposed by the law against the state’s interest and justification for it. Nader v. Brewer, 531 F.3d 1028, 1034 (9th Cir. 2008).
The practices challenged under Anderson-Burdick are evaluated from the vantage point of the burdened voters. See Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 186, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008). The burden in this case is disenfranchisement. It is uncontested that Arizona has disenfranchised a significant number of minority voters, some erroneously, by virtue of its prohibition on out-of-precinct voting, even when legitimate ballots were cast. Their legitimate votes were not counted.
Restrictions on fundamental voting rights cause irreparable injury. League of Women Voters, 769 F.3d at 247. “[Ojnce the election occurs, there can be no do-over and no redress.” Id. Thus, “the injury to these voters is real and completely irreparable.” Id.
The State’s justification for the challenged practice is not specific to the challenged practice. The State cites “significant and numerous” advantages attending a precinct-based voting system. The purported advantages of such a system—such as capping the number of voters attempting to vote in one place on election day and putting polling places closer to voter residences—are belied by the voters’ experiences. But more importantly, these justifications speak only to Arizona’s choice to use a precinct-based system; they do not justify Arizona’s choice to discount ballots cast out of precinct, even when the ballots contain votes the voters were eligible to cast.
Under the proper “balancing and means-end fit framework,” we must “tak[e] into consideration the extent to which [the state’s] interests make it necessary to burden the plaintiffs rights.” Pub. Integrity All., Inc. v. City of Tucson, 836 F.3d 1019, 1024 (9th Cir. 2016) (internal quotations omitted). The State’s articulated interest here is administrative efficiency. The State argues that it will take up to 15 minutes to process legitimate out-of-precinct votes. But in Maricopa County, voters were waiting for between 4 to 6 hours to cast their ballots. The evidence showed that many voters who ended up voting in the wrong precinct traveled there using public transportation and may have had to take time off work. Spending a few minutes of administrative time to permit these citizens’ votes to be counted pales in comparison *641 with the sacrifice made by these voters m pursuit of the exercise of their franchise.
Perhaps more importantly, the requested relief does not involve altering pre-election or election day procedures. Voters still must vote in their precincts if their votes are to be counted as to precinct-specific contests. If a voter casts a ballot in the wrong precinct, it would still be treated as a provisional ballot. The only difference would be that the out-of-precinct vote would be counted as to those elections in which the voter was eligible to vote regardless of precinct.
In addition, when one analyzes how provisional ballots are treated, the burdens are relatively low for the State. It already manually examines the provisional ballots and manually compares addresses. If the ballot is cast in the correct precinct, it is counted. If not, the only additional burden that would be imposed would be to count the votes for the race for which the voter is qualified and eligible to vote. Arizona law provides the State ten days to count provisional ballots. The State is already using manual procedures as to write-in and damaged ballots. These administrative burdens should not be' discounted, but in comparison to the hardships faced by minority voters on election day, the scales weigh in favor of the voters.
The State’s interest in administrative efficiency simply does not justify the means employed: disenfranchisement of out of precinct voters. The plaintiffs were entitled to a preliminary injunction on their Fourteenth Amendment claim.
To be sure, courts must exercise great caution in deciding election challenges close to election day. Purcell v. Gonzalez, 549 U.S. 1, 4-5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). But the relief sought by the plaintiffs does not affect polling procedure; the plaintiffs simply seek to have legitimately cast ballots, which have already been properly collected, counted. And the lynchpin of the district court’s analysis, and relied upon by the majority, is that there are not a substantial number of ballots at issue relative to the entire number of votes cast.
IV
The district court should have granted a preliminary injunction. The plaintiffs showed a statistically significant relationship between Arizona’s practice of declining to count legitimate out-of-precinct votes and a disparate burden on the franchise of minority voters. The district court erred as a matter of law in requiring that the practice have a “meaningful” impact on election results. The plaintiffs established a likelihood of success on both their Voting Rights Act and Constitutional claims. Their ballots should be counted in all races in which they are eligible to vote.
For these reasons, I respectfully dissent.

. As the majority properly notes, the district court assumed, for the purposes of the motion, that expert evidence tendered by the plaintiffs was sufficient to show a cognizable disparate burden under the Voting Rights Act. The majority stated it had "grave doubts” as to this conclusion, but accepted, without deciding, that the plaintiffs carried their burden of proof. Because the first part of the § 2 analysis greatly informs the second part of the examination, it is necessary for me to discuss the proof and the district court’s opinion in some detail.